## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL TUPAC, | § | |
| | § | |
| *Plaintiff,* | § | |
| v. | § | Case No. _____ |
| | § | |
| ASBURY AUTOMOTIVE GROUP, INC.; | § | |
| ASBURY ARLINGTON MB, LLC; and | § | |
| MALCOLM GAGE | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Michael Tupac, by and through the undersigned counsel, brings this action against Asbury Automotive Group Inc. ("Asbury" or the "Company"); Asbury Arlington MB, LLC ("Park Place Motorcars Arlington" or the "Dealership"); and Malcolm Gage, the Dealership's former General Manager ("Gage" or the "GM"), in both his personal capacity and his capacity as GM, for unlawful retaliation in violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A. As alleged below, Respondents retaliated against Tupac when they terminated him for providing information to Asbury for an internal investigation and to the Securities and Exchange Commission for its investigation of suspected securities fraud and accounting irregularities.

### I.        PARTIES

1.        Plaintiff Michael Tupac is an individual and a citizen of the State of California.

2.        Defendant Asbury Automotive Group, Inc. ("Asbury") is a Georgia corporation with principal offices in Deluth, Georgia. Asbury may be served through its registered agent for service of process: Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA, 30092. Asbury is one of the nation's largest automotive retailers. It owns and operates numerous dealership

groups, including non-party Park Place Motorcars ("Park Place"), a Dallas County-based luxury dealership brand Asbury purchased on or about August 2020.

3.      Asbury Arlington MB, LLC is a Delaware limited liability company through which Asbury operates Park Place Motorcars Arlington (the "Dealership") in Arlington, Texas, where Plaintiff worked until his November 14, 2022 termination. The Dealership may be served through its registered agent for service of process: Corporation Service Company d/b/a CSA - Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218 USA.

4.      Malcolm Gage is an individual, who at all times relevant to this suit was a citizen of Texas. He currently lives in Missouri and may be personally served at his residence, 1 Tuscany Park. St. Louis, MO 63105.

## II.        JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 because it arises under federal law—the Sarbanes Oxley Act of 2002 (the "Act")—and under 12 U.S.C. § 5567(c)(4)(D), because 210 days have passed since Plaintiff filed an but administrative complaint on January 12, 2023, and the Secretary of Labor has not issued a final order.

6.      The Northern District of Texas is a proper venue, pursuant to 28 U.S.C. § 1391(b)(2), because it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated. The corporate headquarters for the Park Place family of dealerships is in Irving, Texas, where the improper deals alleged herein were processed and improperly accounted for.

## III.        PROCEDURAL HISTORY/EXHAUSTION

7.      Plaintiff filed an administrative complaint with OSHA on January 12, 2023, which is within 180 days of his November 14, 2022 termination in violation of the Act.

8.      The investigation of Plaintiff's case was terminated through a pilot program intended to speed the ultimate resolution of a complainant's claims. Pursuant to this program, Plaintiff requested that OSHA terminate its investigation and issue findings based on its limited investigatory record.

9.      On that limited record, OSHA was unable to conclude whether there is reasonable cause to believe a violation of the Act occurred, and it dismissed Plaintiff's complaint on April 18, 2023.

10.     On May 18, 2023, Plaintiff timely filed objections to the findings and initiated an appeal with the Office of Administrative Law Judges.

11.     Plaintiff's appeal was docketed on May 31, 2023. On July 28, 2023, the case was set for hearing on February 22, 2024 before Administrative Law Judge Susan Hoffman with a pre-hearing conference set for February 1, 2024.

12.     More than 210 days have passed without a final order from the Secretary of Labor, which entitles Plaintiff to sue in this Court seeking de novo review. *See* 12 U.S.C. § 5567(c)(4)(D).

## IV.      FACTUAL ALLEGATIONS

13.     Asbury is one of the largest automobile dealer groups in the nation. Its strategy for growth depends on acquisitions of existing dealerships groups and increased online sales.

14.     In 2020, pursuant to its growth strategy, Asbury purchased a luxury dealership brand called Park Place Motorcars, which includes the Dealership known as Park Place Motorcars Arlington.

15.     On December 2, 2020, Asbury unveiled "Clicklane," which it billed as the first-ever end-to-end, 100% online car-buying experience.

16.     The company also unveiled its five-year strategic plan to reach $20 billion of revenue by 2025, expand operating margins, and grow EPS in excess of revenue growth.

3

17.     Specifically, the company highlighted the following goals:

- Driving same-store revenue growth of $2 billion over five years,

- Acquiring $5 billion of additional revenue over five years, and

- Adding an incremental $5 billion of revenue through the new Clicklane platform.

18.     Also, in late 2020, Asbury hired Plaintiff as a New Car Sales Manager at Park Place Motorcars Arlington. In that position, Plaintiff supervised about a dozen sales personnel (known as Sales Experience Managers or "SEMs"), and he reported to Roderick Infante, New Car Sales Director, who in turn reported to Gage, the GM.

19.     Plaintiff thus had a front-row seat to the unveiling of Clicklane, its rollout at Park Place Motorcars Arlington, and its local operation in practice compared to Asbury's public statements and in light of its stated financial goals.

**A. Asbury Positions Clicklane as the Cornerstone of a New, Higher Annual Revenue Target of $32 Billion.**

20.     By April 2022, Asbury had increased its annual revenue target to $32 billion for 2025 up from about $15.3 billion in 2022. Ex. 1, Press Release (Apr. 28, 2022). It cited Clicklane, its supposedly "100% online" digital sales channel, as a key driver of this growth, predicting it will drive $8 billion, or 25%, of the anticipated $32 billion.

21.     But Asbury's numerous statements in SEC filings and press releases about Clicklane, and related financial reports/statements, are simply false. For example, Clicklane is not "100% online" because in some states, like Texas, customers must, upon delivery of the vehicle, physically sign all the paperwork they previously completed through Clicklane.

22.     Asbury required Plaintiff New Car Sales Manager, and the Sales Experience Mangers ("SEMs") who reported to him, to process car sales that were completed in-store as if they had been completed online through Clicklane. Ex. 2, Clicklane Management Process. Using in-store iPads

and Internet kiosks, SEMs converted walk-in customers into "online" Clicklane sales, and the Company accounted for them as such.

23.     These requirements were part of a concerted effort to improperly inflate the volume of Clicklane deals reported in securities filings and press releases, pumping up Asbury's stock price and giving the false impression that Asbury had a digital advantage over its competition.

24.     Additionally, Managers, including Tupac, were required to alter Company records to make non-Clicklane customers appear to be true online purchasers. If a customer was already in the Company's customer-relationship-management system from another lead source, a Sales Manager or a Director (to whom Sales Managers report) would create a new entry and designate Clicklane as the lead source. Then the two entries would be "merged" so that Clicklane appeared to be the exclusive lead source.

25.     In one-page deal summaries, the Manager or Director who approved each deal would remove their initials and designate the deal as "Clicklane."

26.     Tupac and his fellow employees discussed their unease at closing transactions in this way. They also discussed similar discomfort with Gage's common practice of instructing them to book sales either for the end of one month or the beginning of the next, depending on which looked better for the store's numbers or improved his compensation.

**B.  Tupac Reports Serious Misconduct to the Company**

27.     In 2022, Plaintiff observed and reported several instances of serious misconduct, including sexual harassment; violations of the FMLA and ADA; and, as relevant here, violations of the securities laws and GAAP.

28.     Because Gage was involved in the misconduct, Plaintiff followed the Company's open-door policy and took his concerns directly to Jed Milstein, Asbury's Senior Vice President and Chief Human Resources Officer.

29.     In a letter dated July 18, 2022, Plaintiff's counsel identified several examples of the misconduct described above and flagged the need to discuss accounting and compliance concerns Tupac had about the Company's and the Dealership's operations. Milstein referred Plaintiff's counsel to Dean Calloway, Asbury's Vice President and Associate General Counsel.

30.     Calloway and Plaintiff's counsel had a telephone call on August 12, 2022. Calloway, however, abruptly ended the call before discussing the accounting and compliance concerns.

31.     On August 29, 2022, Plaintiff's counsel flagged the omission, asking for a second call, but Calloway ignored the request for over a week. Eventually, when pressed, he agreed to a call but did not cooperate with Plaintiff's counsel to schedule it.

32.     In July and August 2022, Asbury did not take any action to address the concerns Plaintiff raised, and it affirmatively avoided Plaintiff's report of accounting and compliance concerns.

33.     So, on September 9, 2022, Plaintiff, through his attorney, reported to Asbury in writing suspected violations of the securities laws and GAAP, including specific incidences of suspected misconduct:

> (1) Gage directed the SEMs to falsify the Dealership's books and records by recording sales in months they did not occur to make the Dealership's performance look better than it was;
>
> (2) Store management regularly manipulated the customer satisfaction index scores by providing free equipment to customers who gave the Dealership poor marks in exchange for redoing or revising their satisfaction surveys; and
>
> (3) most concerningly, there appeared to be a coordinated effort among at least the Park Place dealerships to improperly pump up the sales volume attributable to Asbury's online sales tool-called Clicklane-by reclassifying traditional, in-person

sales as Clicklane deals and reporting unrealistic sales data in press releases and during quarterly calls with analysts and investors.

34.  Tupac reasonably believed such conduct violated federal law governing public accounting, internal controls, and securities fraud. The email reporting his concerns, attached as Exhibit 3, noted that certain SEC filings and investor presentations made material misrepresentations about Clicklane that likely violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.

35.  The September 9, 2022 email put the Company on notice that Tupac had engaged in SOX-protected activity. In fact, the report itself was protected activity under SOX. *See* 18 U.S.C. § 1514(a)(1)(C).

36.  On September 14, 2022, Plaintiff provided Asbury evidence supporting his internal report, including:

(1) A copy of the Dealership's official policy to steer in-person customers into Clicklane deals;

(2) Deal numbers for transactions in which Gage gave friends and contacts sweetheart deals to the detriment of the Company and certain employees' compensation;

(3) A list of employees with whom the Company could confirm the information Tupac provided.

37.  Plaintiff further supplemented his internal report on October 7, 2022, reporting the following:

(1) The Company's training of the former Parts and Serviced Director, Diki Terry, for management was part of its retaliatory plan to terminate and replace Mr. Tupac.

(2) When deals are misclassified to Clicklane, they are improperly booked as Clicklane deals, which may result in materially misleading financial statements.

(3) False statements and material omissions that may improperly inflate the Company's stock value include that Clicklane is "100% online," the reported average transaction times, reported and projected Clicklane revenue, and projected Company revenue (among others).

38.     The reports were given to Calloway because, as Vice President and Associate General Counsel, he had the authority to investigate, discover, and terminate misconduct at the Company. *See id.*

39.     Alternatively, if Calloway did not have such authority in his own right, Jed Milstein, the Company's Chief Human Resources Officer, had such authority. And Milstein delegated it to Calloway and instructed Plaintiff's counsel to communicate solely with Calloway.

**C.  Tupac Reports Serious Misconduct to the SEC**

40.      By mid-September, it had become apparent that internal reporting would be insufficient to address the suspected violations of law Tupac observed. So, on September 13, 2022, Plaintiff submitted a written whistleblower report to the SEC, which is attached as Exhibit 4.

41.     An SEC investigator reached out to Tupac's counsel the very next day, seeking Tupac's cooperation in answering in writing two rounds of follow-up questions.

42.     On information and belief, the SEC launched a full investigation of Asbury shortly thereafter.

43.     On November 7, 2023, Asbury announced a key hire: Nathan Briesemeister as Vice President, Chief Accounting Officer & Controller of the Company. Briesemeister is an expert on internal controls and SOX compliance. On information and belief, Asbury hired him to address accounting misconduct and take a key role in responding to the SEC's investigation.

**D. Asbury Retaliates**

44.　　The Company's campaign of retaliation began no later than September 16, 2022—one week after Plaintiff's initial internal report—when Bob Chadwick introduced himself by email as Asbury's outside counsel. In an introductory email, he suggested he would scour Tupac's employment file for reasons to discipline or terminate him. He didn't even pretend to be concerned with investigating Plaintiff's reports of misconduct.

45.　　Chadwick also accused Plaintiff of removing confidential information from the Dealership and, in direct violation of SEC rules, threatened to enforce a confidentiality agreement Plaintiff signed when he was hired. *See* 17 C.F.R. 254.21F-17(a) ("No person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement with respect to such communications . . . .").

46.　　Meanwhile, Gage constantly harassed, intimidated, and bullied Plaintiff at the Dealership by:

    (1)　Scrutinizing his performance far more than that of any other employee;

    (2)　Overloading him with low-value tasks to increase his workload and invite mistakes;

    (3)　Moving up deadlines without notice; and

    (4)　Canceling a meeting five minutes before it was scheduled to begin but later accusing Tupac of missing the meeting without excuse.

47.　　Tupac learned through conversations with colleagues in August and September that they too were disturbed by the policy requiring them to falsely record offline sales as Clicklane deals. Certain of them also resented Gage's sweetheart deals for friends for reducing monthly Dealership profits and, in turn, their compensation.

### E.  Asbury "Investigates"

48.       On October 3, 2022, following these conversations, the Company stepped up its retaliation campaign.

49.       Gage issued a Final Written Counseling, attached as Exhibit 5, labeling Plaintiff's conversations with co-workers "harassment."

50.       Gage conceded the National Labor Relations Act protects an employee's right to accumulate information but tried to nullify that right by calling his protected activity "harassment."

51.       That afternoon, Gage held the weekly Directors meeting long past its normal end time, forcing Tupac to remain on the sales floor until 2 p.m. On information and belief, Gage knew that Tupac had been approved to use intermittent FMLA leave that day starting at 1 p.m. to receive in-office treatment for a flare-up of an autoimmune disorder called hidradenitis suppurativa ("HS").

52.       That same day, Chadwick sent a letter accusing Tupac of three "terminable offenses,— removing confidential information, refusal to perform assigned tasks, and harassment of coworkers. The letter threatened termination and directed Tupac not to discuss the matters with coworkers.

53.       Chadwick's letter announced a Company investigation run by Sandy Lauro, another outside lawyer Asbury hired, that targeted Tupac rather than the misconduct he reported. The letter states Asbury would investigate "rather than tak[e] immediate action" against Tupac, but it already had when Gage wrote him up for so-called "harassment."

54.       Lauro introduced herself and, the next day, explained she would be a "neutral fact-finder" and would not make any decisions or recommendations after the investigation." But Asbury paid her, and Lauro and Chadwick refused requests to share her findings.

55.       Tupac fully cooperated with the investigation. He sat for two three-hour interviews and, as requested, provided documents, supplemental information, and a list of potential witnesses.

56.     But many of those with the most knowledge of relevant facts were not interviewed, including several SEMs who knew about the improper, sweetheart deals Gage gave his friends.

57.     On information and belief, the "investigation" did not address Gage's financial misconduct and falsification of deal dates at all.

**F.  Gage Snubs Tupac for an Expected Promotion**

58.      The retaliation continued when Infante announced on October 20, 2022 that he was moving to Florida to become general manager of an Asbury dealership there. The Company immediately posted his position and, just days later, announced that Raymond Resch, Pre-Owned Sales Manager at Park Place Lexus in Grapevine, would fill it.

59.     Plaintiff was permitted to apply and interview, but several facts make plain that Plaintiff never had a chance:

      a)  Gage conducted at most six interviews of 30 minutes or less, devoting far less time to filling a key role than is typical at Park Place.

      b)  Gage interviewed Tupac but dismissed him after less than 15 minutes.

      c)  Gage scheduled Tupac's interview for shortly before his second interview with Lauro and with only 2.5 hours' notice. This stunt prevented Tupac from preparing for his interview with Gage and distracted him from preparing for his interview with Lauro.

      d)  Gage exercised authority over Tupac's potential promotion during an investigation into whether Gage had retaliated against Tupac. The Company made no attempt to ensure a fair process in these circumstances.

60.     Plaintiff's counsel emailed Chadwick about these concerns before the interview, but he never replied.

61.     Additionally, on information and belief, discovery will show that Gage, for the express purpose of denying the promotion to Tupac, solicited the names of potential candidates from other Park Place GMs. Finding no one as well-suited as Tupac, Gage nevertheless hired Resch, despite his unsatisfactory performance at Lexus Grapevine and that GM's decision to move him

11

from New Car Sales Manager to Pre-Owned Car Sales Manager with plans to eliminate his position entirely.

62.     Absent retaliation, Tupac would have received the promotion. As recently as March 2022—before Tupac's reports—Gage encouraged Tupac to stay in Arlington in anticipation of this Director opportunity instead of interviewing for a Sales Manager position in Dallas.

63.     The opportunity was expected soon because the Company sponsored Infante to participate in a rigorous training program to become a General Manager, and Infante had recently completed, or would soon complete, the program. Gage said that Tupac, as the only Sales Manager in Arlington, would not face serious competition for New Car Sales Director, whereas in Dallas, four or five other Sales Managers would vie for an open Director position.

64.     Moreover, Plaintiff is an objectively better fit for the position than Resch. Tupac knows the Mercedes-Benz brand and local operations and personalities. His duties as New Car Sales Manager were nearly identical to Infante's. Tupac could have hit the ground running immediately. Resch had to get up to speed on Mercedes-Benz vehicles, its systems (which takes 60-90 days), local operations, and his new colleagues-all while adjusting to his new role as Director.

**G.  Gage Terminates Tupac for His Protected Activity**

65.     On November 14, 2022, Gage summoned Tupac to HR and terminated him for unspecified "misconduct." But the Company's true, retaliatory motive was unmistakable, given Chadwick's attempts to intimidate, Gage's animus, Lauro's strategic interviews, the write-up for "harassment," the failure to promote, and their proximity in time to Plaintiff's internal report to Asbury, his submission to the SEC, and his disclosure that he was cooperating with the SEC.

**H.  Tupac Searches for Work in Texas for Over Six Months Before Taking a Position in California.**

66.      Plaintiff applied to about 150 positions in the DFW-area over more than six months. He received only about ten interviews, including callback interviews with the same employer.

67.      Plaintiff progressed through the interview process at several dealerships with a decision to hire seeming imminent. But none panned out.

68.      In June 2023, having scoured the Texas market without success, Plaintiff began seeking positions in California.

69.      Within two weeks, Plaintiff was hired as a Sales Manager by a new dealership, Cadillac of Calabasas. Within five months, Plaintiff was promoted to Director of Sales.

70.      But before finding employment, Plaintiff had to take out a $50,000 personal loan to make ends meet during his extended period of unemployment. He and his partner each incurred $10,000 of credit card debt. They also borrowed $9,000 from Plaintiff's partner's parents.

71.      Absent Defendants' illegal retaliation, none of this borrowing would have been necessary, and Plaintiff and his partner would not have incurred the debt or been charged the associated interest and finance charges.

72.      As Director of Sales at Cadillac of Calabasas, Plaintiff no longer has to borrow money for ordinary living expenses, but accepting the employment forced him to live apart from his partner and caused him damages of thousands of dollars for moving expenses and to maintain a second household—none of which he would have incurred absent Defendants' illegal retaliation.

**I.  Asbury Fires Plaintiff, Citing Bogus Bank and Odometer Fraud**

73.      Not until Asbury responded to the administrative complaint Plaintiff filed with OSHA did Plaintiff learn Asbury's pretext for terminating him: purported bank and odometer fraud. Ex. 6, Letter from B. Chadwick to R. Williams, OSHA Investigator (Feb. 20, 2023) at 2, 11.

74.     There was no fraud.

75.     On November 14, 2015, SEM Jennifer Stapleton was working on the sale of a used vehicle, and Tupac was supervising. When the customer sought financing, the mileage of the vehicle was submitted incorrectly to lenders through an online system known as DealerTrack. Instead of approximately 155,000 miles, the mileage was reported as approximately 15,000 miles, effectively overstating the vehicle's value.

76.     The parties agree that the initial incorrect submission was "inadvertent error." *Id.* at 11. Asbury, however, claims that Tupac purposely resubmitted the same incorrect mileage to obtain financing approvals the customer was not qualified for and thereby committed bank and odometer fraud. *Id.*

77.     That purported justification for Plaintiff's termination is implausible. First, Plaintiff had practically nothing to gain and everything to lose from submitting false numbers. At best, based on his compensation structure, and given the deal belonged to Stapleton, he would have made approximately $20 more for selling the car. No reasonable person would take such a risk for $20. All the more so here because Plaintiff suspected Asbury was searching for a reason to fire him.

78.     Second, Tupac reported misconduct, accounting irregularities, and potential securities fraud internally and to the SEC at great risk to his career. An employee willing to do the right thing in those circumstances would not throw it all away to commit bank fraud and gain virtually nothing from it.

79.     Third, because the error was discovered after the first submission, Plaintiff would have had no reason to think he could submit the same incorrect information again and the error not be caught.

80.     A software issue was the true reason most lenders received the incorrect mileage a second time. When Tupac corrected the mileage in Dealertrack, the system appeared to apply the

higher mileage to all lenders. But it turns out only the application to Capital One was changed because that was the lender in whose portal the change was made. The changes do not actually populate across lenders, although DealerTrack made it appear as though they did.

81.    Stapleton can corroborate Tupac's version of events.

82.    The conduct of Asbury's counsel casts additional doubt on Asbury's purported reason for firing Tupac. Before OSHA, Chadwick argued the deal documents from the vehicle's sale, attached to its response as exhibit I, proved the fraud. Bizarrely, Chadwick submitted its response with every exhibit attached except Exhibit I. Chadwick explained that his office was still redacting "confidential customer information." Ex. 6, at 7.

83.    Nearly 7 1/2 hours later he said, "Attached is exhibit I, which has been redacted to delete private customer information." *Id.* But it was immediately apparent his office had redacted much more, including key information from a transaction log containing information such as what Plaintiff and Stapleton did with respect to the sale and when. *See id.* at 2–6.

84.    Plaintiff's counsel requested a revised copy that redacted "*only* confidential customer information." *Id.* at 2. Chadwick acknowledged "there is additional information on these pages which can be disclosed to OSHA (and Mr. Tupac) without revealing this private customer information" and promised "Asbury will produce an amended version of Exhibit I." *Id.*

85.    But Asbury never did. And Chadwick ignored at least two follow-up emails over three weeks requesting the amended document.

86.    Even more damning, the first page of Exhibit I showed that Asbury accounted for the deal as a Clicklane deal:

EXHIBIT I



87.     Had the deal truly been a "100% online" Clicklane deal, Plaintiff's typographical error would not have been possible in the first instance. And the customer would have entered the car's mileage and submitted the financing application himself online.

88.     Asbury cannot have it both ways: either the deal was a Clicklane deal for which Plaintiff cannot be accused of bank or odometer fraud, or it was an in-person deal that cannot be classified as Clicklane. Regardless, Plaintiff did not commit any fraud.

89.     Asbury proffered to OSHA a handful of other supposed justifications for the termination. Each is either manufactured or easily explainable, and none prompted Asbury to terminate Tupac when they occurred.

90.     The bottom line is that Asbury terminated Tupac for engaging in activity protected by the whistleblower provisions of the Sarbanes Oxley Act, and the facts do not support Asbury's claim to the contrary.

**COUNT I**

**Retaliation in Violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A**

91.     Plaintiff incorporates by reference the allegations of each and every paragraph in this Complaint as if fully set forth herein.

92.     Defendants have violated 15 U.S.C. § 78u-6(h)(l) because their decision to terminate Plaintiffs employment was motivated, in part, by his making disclosures that are protected by Section 806 of the Sarbanes Oxley Act (18 U.S.C. § 1514A).

93.     Asbury is covered by the Sarbanes Oxley Act because it (a) has "a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l)"; and (b) "is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o (d))." 18 U.S.C. § 1514A(a).

94.     Park Place Motorcars Arlington is covered by the Sarbanes Oxley Act because it is an affiliate of Asbury, which is covered by 18 U.S.C. § 1514A, for the reasons set forth above.

95.     Gage is covered by the Sarbanes Oxley Act because he is an employee or agent of Asbury and/or Park Place Motorcars Arlington, which are covered by 18 U.S.C. § 1514A, for the reasons set forth above.

96.     Plaintiff engaged in activity that is protected by Section 806 of the Sarbanes Oxley Act (18 U.S.C. § 1514A) when he informed Asbury's Dean Calloway and Jed Milstein about conduct that he reasonably believed violated "provision[s] of Federal law relating to fraud against shareholders," including, but not limited to, SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), which prohibits

making false statements or engaging in deceptive practices in connection with the sale of securities. 18 U.S.C. § 1514A (a)(l)(C).

97.     His internally reported the following conduct through his attorney by email on September 9, 2022:

> (1) Falsification, at Gage's behest, of the Dealership's books and records by recording sales in months they did not occur to make the Dealership's performance look better than it was;
>
> (2) Manipulation of customer satisfaction index scores by providing free equipment to customers who gave the Dealership poor marks in exchange for redoing or revising their satisfaction surveys; and
>
> (3) Coordination of a plan to pump up the sales volume attributable to Clicklane-by reclassifying traditional, in-person sales as Clicklane deals and reporting unrealistic sales data in press releases and during quarterly calls with analysts and investors.

98.     He provided Asbury evidence on September 14, 2022 to support his internal report:

> (1) A copy of the Dealership's official policy to steer in-person customers into Clicklane deals;
>
> (2) Deal numbers for transactions in which Gage gave friends and contacts sweetheart deals to the detriment of the Company and certain employees' compensation;
>
> (3) A list of employees with whom the Company could confirm the information Tupac provided.

99.     And Plaintiff supplemented his internal report on October 7, 2022, reporting the following:

(1) The Company's training of the former Parts and Serviced Director, Diki Terry, for management was part of its retaliatory plan to terminate and replace Mr. Tupac.

(2) When deals are misclassified to Clicklane, they are improperly booked as Clicklane deals, which may result in materially misleading financial statements.

(3) False statements and material omissions that may improperly inflate the Company's stock value include that Clicklane is "100% online," the reported average transaction times, reported and projected Clicklane revenue, and projected Company revenue (among others).

100. Tupac reasonably believed such conduct violated federal law governing public accounting, internal controls, and securities fraud. For example, the email from Tupac's lawyer observed that certain SEC filings and investor presentations made material misrepresentations about Clicklane that likely violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.

101. That the SEC opened an investigation to following Plaintiff's report underscores the reasonableness of Plaintiff's belief. Additionally, the fact that there have been at least nine stock sales by Asbury insiders and no purchases suggests that Asbury insiders see trouble ahead.

102. Plaintiff engaged in additional activity that is protected by Section 806 of the Sarbanes Oxley Act (18 U.S.C. § 1514A) when he reported the same conduct to the SEC. *See* Ex. 4.

103. Approximately two months after these reports Asbury terminated Plaintiff's employment. It gave no reasons at the time, but its belated explanation of bank and odometer fraud is flatly wrong. *See* Part IV.I., *supra.* Defendants have violated 15 U.S.C. § 78u-6(h)(l)(A) because Plaintiff's protected activity was a contributing factor in their decision to terminate his employment.

104. Plaintiff suffered damages, including but not limited to lost pay and benefits; interest and finance charges on personal loans taken to meet living expenses; moving expenses and expenses

to maintain a second household after having to leave Texas to find work; and special damages for impairment of reputation, personal humiliation, and mental anguish. Additionally, Defendants' conduct required Plaintiff to retain an attorney and pay for his services

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

## PRAYER

For the foregoing reasons, Plaintiff ask this Court to enter judgment against Defendants, jointly and severally, for "all relief necessary to make [him] whole," 18 U.S.C. § 1514A(c), including at least:

(1) Back pay consisting of lost wages and benefits calculated based on the Sales Director position to which he would have been promoted absent prohibited retaliation;

(2) Reinstatement as New Car Sales Director or, alternatively, front pay;

(3) Compensatory damages for economic harm, including but not limited to expenses incurred in moving to California to take work while maintaining a household in Texas, interest and other expenses incurred to take out the personal loan, expenses that would have been covered by the Asbury health plan, and the like;

(4) Special damages for impairment of reputation, personal humiliation, and mental anguish;

(5) Prejudgment and post-judgment interest;

(6) Attorney's fees and costs; and

(7) Any other relief to which Plaintiff may show himself justly entitled.

DATE: January 13, 2024

Respectfully submitted,

/s/ *R. Kent Piacenti*
R. Kent Piacenti
Texas Bar No. 24083660
LAW OFFICE OF R. KENT PIACENTI, PLLC
8350 N. Central Expy, Ste. 1900, PMB 3169
Dallas, TX 75206
Telephone: 214-888-3639
Facsimile: 214-396-2025
kent@piacentilaw.com

*Attorney for Plaintiff Michael Tupac*