# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL DAVID TUPAC, | § | |
| | § | |
| *Plaintiff,* | § | |
| v. | § | Case No. 3:24-cv-00104 |
| | § | |
| ASBURY AUTOMOTIVE GROUP, | § | |
| INC.; ASBURY ARLINGTON MB, | § | |
| LLC; and | § | |
| MALCOLM GAGE | § | |
| | § | |
| *Defendants.* | | |

## PLAINTIFF MICHAEL TUPAC'S BRIEF IN RESPONSE TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6) AND MEMORANDUM OF LAW IN SUPPORT

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Allen v. Admin. Review Bd.,*
514 F.3d 468 (5th Cir. 2008) ....................................................16, 17, 18, 19, 20

*Wallace v. Tesoro Corp.,*
796 F.3d 468 (5th Cir. 2015) ..........................................................................17

## STATUTES

12 U.S.C. § 5567(c)(4)(D) ........................................................................................15

18 U.S.C. § 151 .........................................................................................................17

18 U.S.C. § 1514A(a) ..........................................................................................17, 18

## REGULATIONS

17 C.F.R. § 240.21....................................................................................................12

## I.  INTRODUCTION

In late 2020, Plaintiff was hired as New Car Sales Manager at Park Place Motorcars Arlington, an Asbury dealership within the Park Place Motorcars dealership group. About the same time, Asbury began to roll out its new online-car-sales platform, Clicklane. Asbury billed Clicklane as "100% online," "inclusive of all documentation, loan origination and everything in between." It claimed customers, on average, could purchase a car without financing in a mere 8 minutes with financing increasing the average to just 14 minutes. From his experience as a sales manager, both overseeing and personally completing transactions, Plaintiff Michael Tupac knew these statements were false and fraudulent and submitted a tip to the SEC that his employer, Asbury Automotive Group, Inc. ("Asbury"), may have committed securities fraud through false public statements about its online-car-sales platform, Clicklane. Plaintiff worked as New Car Sales Manager at Park Place Motorcars Arlington (the "Dealership"), a dealership within the Park Place Motorcars ("Park Place") dealership group, which is owned by Asbury. An SEC investigator sought more information from Plaintiff right away, demonstrating the reasonableness of Plaintiff's belief that Asbury may have committed fraud or violated SEC rules or regulations.

Nevertheless, Defendants ask the Court to hold Plaintiff's belief was objectively unreasonable. Under Fifth Circuit precedent, as long as reasonable minds could

disagree, this question should not be decided as a matter of law. The Court should deny the motion to dismiss.

## STATEMENT OF FACTS

Asbury is one of the largest automobile dealer groups in the nation. Its strategy for growth depends on acquisitions of existing dealerships groups and increased online sales. Am. Compl. ¶ 13.  In 2020, pursuant to its growth strategy, Asbury purchased a luxury dealership brand called Park Place Motorcars, which includes the Dealership known as Park Place Motorcars Arlington. *Id.* ¶ 14

On December 2, 2020, Asbury unveiled "Clicklane," which it billed as "the automotive retail industry's first, end-to-end, 100% online vehicle retail tool." *Id.* at 15. Asbury claimed customers could "complet[e] the purchase or sale of vehicles completely online inclusive of all documentation, loan origination and everything in between." ECF No. 16, at 9.

Around the same time, Asbury hired Plaintiff as New Car Sales Manager at Park Place Motorcars Arlington. *Id.* at 18 In that position, Plaintiff supervised about a dozen sales personnel (known as Sales Experience Managers or "SEMs"), and he reported to Roderick Infante, New Car Sales Director, who in turn reported to Gage, the GM. *Id.* at 18 Plaintiff thus had a front-row seat to the unveiling of Clicklane, its rollout at Park Place Motorcars Arlington, and its operation in practice in contrast to Asbury's public statements. *Id.* at 19

### A. Asbury Positions Clicklane as the Cornerstone of its Goal to Increase Annual Revenue by Billions of Dollars.

In late 2020, the Company unveiled a five-year strategic plan to reach $20 billion of annual revenue by 2025. *Id.* at 16. In 2022, Asbury increased the target to $32 billion. Asbury cited Clicklane, it supposedly "100% online" digital sales channel, as the key driver of growth, predicting it would generate 25% of the Company's annual revenue target ($5 billion of the $20 billion goal set in 2020 and $8 billion of the $32 billion goal set in 2022). *Id.* at 20

Asbury told investors Clicklane gave it "a competitive advantage as the vehicle buying process evolves in a digital environment." But its numerous statements in SEC filings and press releases about Clicklane, and related financial reports/statements, are simply false. *Id.* at 41. For example:

- Asbury says Clicklane is 100% online, but it's not. In states that require wet signatures on documents, such as Texas, Asbury voids the online signatures and the customer signs all new paperwork by hand upon delivery of the documents. *Id.* at 41

- Asbury says the average cash purchase takes 8 minutes and financed purchase takes 14 minutes on Clicklane, but those transactions take at least that much time and usually far longer, especially when including the time spent completing the duplicative paperwork referred to above. *Id.* at 41

- Asbury says 92% of Clicklane deals are "incremental"--i.e. customers Asbury would not otherwise have had, but the percentage is grossly

inflated, as shown by the systematic reclassification of in-store purchases as online Clicklane deals.[1] *Id.* at 41

To juice Clicklane's numbers, Asbury set aggressive sales goals and tied the compensation of its General Managers to sales performance with respect to Clicklane. *Id.* at 41. At Park Place Motorcars Arlington, Gage required Plaintiff New Car Sales Manager, and the Sales Experience Mangers ("SEMs") who reported to him, to process in-store car sales as if they had been completed online through Clicklane. Am. Compl. Ex. 2, Clicklane Management Process.

Using in-store iPads and Internet kiosks, SEMs converted walk-in customers into "online" Clicklane sales, and the Company improperly accounted for them as such. *Id.* at 22. These requirements were part of a concerted effort to inflate the volume of Clicklane deals reported in securities filings and press releases, pumping up Asbury's stock price, and giving the false impression that Asbury had a digital advantage over its competition. *Id.* ¶ 22.

Managers, including Plaintiff, were required to alter Company records to make non-Clicklane customers appear to be true online purchasers. *Id.* at 24. If a customer was already in the Company's customer-relationship-management system from another lead source, a Sales Manager or Director would create a new entry,

---

[1] Asbury's assertion that 95% of vehicles purchased through Clicklane are delivered to locations within 50 miles of an Asbury dealership casts further doubt on claims of incremental sales. If the vast majority of vehicles are being delivered in the communities where Asbury operates, it is unlikely that only 8% of vehicles purchased would have been purchased from an Asbury dealership if Clicklane were not an option.

designating Clicklane as the lead source. *Id.* ¶ 24. Then the two entries would be "merged" so that Clicklane appeared to be the exclusive lead source. *Id.* ¶ 24. In one-page deal summaries, the Manager or Director who approved each deal would remove their initials and designate the deal as "Clicklane." *Id.* ¶ 25.

### B. Plaintiff Reports Serious Misconduct to the Company

In 2022, Plaintiff observed and reported several instances of sexual harassment; violations of the FMLA and ADA; and, as relevant here, securities fraud and violations of SEC rules. *Id.* ¶ 27. Because Gage was involved in the misconduct, Plaintiff followed the Company's open-door policy and took his concerns directly to Jed Milstein, Asbury's Senior Vice President and Chief Human Resources Officer. *Id.* ¶ 28.

In a letter dated July 18, 2022, Plaintiff's counsel identified specific instances of sexual harassment and specific violations of Plaintiff's rights under the FMLA and ADA. *Id.* ¶ 29. The letter also flagged the need to (verbally) discuss certain accounting and compliance concerns Plaintiff had about the Company's and the Dealership's operations, but it did not report the substance of those concerns. *Id.* ¶ 29.

Milstein referred Plaintiff's counsel to Dean Calloway, Asbury's Vice President and Associate General Counsel. *Id.* ¶ 29. Over a period of several weeks, Calloway gave Plaintiff's counsel the runaround, speaking to him only briefly once and abruptly

terminating the call before discussing the accounting and compliance concerns. *Id.* ¶ 30.

Because Asbury failed to address Plaintiff's concerns about sexual harassment and FMLA and ADA violations and affirmatively avoided the verbal report of accounting and compliance concerns Plaintiff asked his attorney to make, Plaintiff finally instructed his attorney to provide the report in writing. *Id.* ¶ 32.

So, on September 9, 2022, Plaintiff's counsel emailed Calloway and explained Plaintiff's suspicions that Asbury may have violated federal securities laws and rules governing accounting. *Id.* ¶ 33. He explained that there appeared to be a coordinated effort among at least the Park Place dealerships to improperly pump up the sales volume attributable to Clicklane by reclassifying traditional, in-person sales as Clicklane deals. *Id.* ¶ 33. He lated explained that deals misclassified to Clicklane were also improperly booked as Clicklane deals, which may have result in materially misleading financial statements. *Id.* ¶ 34.

On September 14, 2022, Plaintiff provided Asbury evidence supporting his internal report, including (among other things) a copy of the Dealership's official policy to steer in-person customers into Clicklane deals. *Id.* ¶ 36. Moreover, through his attorney, Plaintiff explained that statements made in recent SEC filings and investor presentations about Clicklane and the Company's current and anticipated financial condition likely violated Section 10(b) of the Exchange Act and Rule 10b-5, which

prohibit untrue statements of material fact in connection with the purchase or sale of securities. Am. Compl. Ex. 3 at 5.   Later, Plaintiff identified the following misstatements of material fact from Asbury's public filings:

- That Clicklane is "!00%" online

- That the reported average transaction times on Clicklane were far shorter than they really are;

- That revenue attributable to Clicklane was overstated because it included in-store purchases that should have been accounted for as such.

- The omission of material facts surrounding how Asbury accounts for Clicklane in its projected revenue figures for Clicklane and the Company as a whole rendered those numbers misleading and lacking a reasonable basis.Am. Compl. ¶ 37.

## C. Plaintiff Reports Serious Misconduct to the SEC

By mid-September, it had become apparent that internal reporting would be insufficient to address the suspected violations of law Plaintiff observed. So, on the evening of September 13, 2022, Plaintiff submitted a written whistleblower report to the SEC. *See* Am. Compl. Ex. 4

Plaintiff reported "[m]aterial misstatement[s] or omission[s] in [Asbury's] public filings or financial statements" and laid out in detail the nature of the fraud:

> Asbury Automotive Group has set an annual revenue target of $32 billion for 2025 up from about $15.3 billion in 2022. It cites Clicklane,

its supposedly "100% online" digital sales channel, as a key driver of this growth, predicting $8 billion, or 25%, of the anticipated $32 billion will come from Clicklane. But its numerous statements in SEC filings and press releases about Clicklane, and related financial reports/statements, are simply false. For example:

> -Asbury says Clicklane is 100% online, but it's not. In states that require wet signatures on documents, such as Texas, Asbury voids the online signatures and the customer signs all new paperwork by hand upon delivery of the documents.
> -Asbury says the average cash purchase takes 8 minutes and financed purchase takes 14 minutes on Clicklane, but both take far longer.
> -Asbury says 92% of Clicklane deals are "incremental"--i.e. customers Asbury would not otherwise have had, but the percentage is grossly inflated.

The purpose of these misstatements is to give the false impression that Asbury has a competitive digital advantage that it does not have, and the effect is an inflated share price. Moreover, there is a concerted effort to improperly inflate the volume of Clicklane deals by misclassifying deals from other channels as though they had happened online. This is occurring in at least the Park Place branded dealerships, of which there are eight, and which constitute nearly 10% of the dealerships currently using Clicklane. Included with this submission is a process document from one of the Park Place stores (Arlington), describing the three types of transactions that can be classified as Clicklane deals, two of which expressly funnel in-person customers into Clicklane deals. . . .

This misclassifications of deals is encouraged by a compensation system that rewards General Managers and director-level employees based on Clicklane performance metrics, all of whom stress the importance of Clicklane deals to salespeople who are keenly aware of Asbury's intense focus on Clicklane as its supposedly 100% online sales channel. Management uses the inflated Clicklane numbers in earnings releases, earnings calls, and investor presentations to show that Asbury's direct online purchase tool is far more successful than it is, generating a large and growing share of sales that significantly outpaces reality. In particular, see slides 15-18 of the July 2022 Investor Relations

Presentation, which is included in this submission. The intent is to represent Asbury as more competitive with direct online models such as Carvana and Vroom than it really is. *Id.* ¶ 41.

An SEC investigator reached out to Plaintiff's counsel ***the very next morning***, seeking Plaintiff's assistance in providing more information about the suspected fraud. *Id.* ¶ 42. Plaintiff, relying on his experience and training in car sales, submitted written answers to an initial set of questions about Asbury and Clicklane and later answered a set of follow-up questions in writing too. *Id.* ¶ 42.

Plaintiff does not know with certainty whether the SEC launched a full investigation because its investigations are generally non-public, but just a few weeks after Plaintiff's reports, Asbury announced it had hired Nathan Briesemeister, an expert on internal controls and SOX compliance, as Vice President, Chief Accounting Officer & Controller of the Company, suggesting Asbury may have determined it needed his assistance in responding to the SEC or in strengthening its compliance regime. *Id.* ¶ 44. Additionally, since Plaintiff's reports, insiders' transactions in the Company's securities have consisted almost exclusively of sales.  The only reported acquisitions stem from Company grants or the vesting of options. There are no recent open-market purchase of Asbury stock, suggesting Company insiders seek troubled times ahead for Asbury. *Id.* ¶ 107.

### D. Asbury Retaliates

The Company's campaign of retaliation began no later than September 16, 2022—one week after Plaintiff's initial internal report and during the time Plaintiff was cooperating with the SEC—when Bob Chadwick, Asbury's outside counsel, accused Plaintiff of removing confidential information from the Dealership and, in direct violation of SEC rules, threatened to enforce a confidentiality agreement Plaintiff signed when he was hired. *See* 17 C.F.R. § 240.21F-17(a) ("No person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement with respect to such communications . . . ."). Am. Compl. ¶ 45.

#### 1.  Harassment and Intimidation

Meanwhile, Gage constantly harassed, intimidated, and bullied Plaintiff at the Dealership by:

(1) Scrutinizing his performance far more than that of any other employee;

(2) Overloading him with low-value tasks to increase his workload and invite mistakes;

(3) Moving up deadlines without notice; and

(4) Canceling a meeting five minutes before it was scheduled to begin but later accusing Plaintiff of missing the meeting without excuse. *Id.* ¶ 47.

### 2.  The Write-Up

On October 3, 2022, following these conversations, the Company stepped up its retaliation campaign when Gage issued a Final Written Counseling, labeling Plaintiff's conversations with co-workers "harassment." *See* Am. Compl. Ex. 5.

That same day, Chadwick sent a letter accusing Plaintiff of three "terminable offenses,—removing confidential information, refusal to perform assigned tasks, and harassment of coworkers. Am. Compl. ¶ 53. The letter threatened termination and directed Plaintiff not to discuss the matters with coworkers. *Id.* ¶ 53.

### 3.  The Investigation

Chadwick's letter announced a Company investigation run by Sandy Lauro, another outside lawyer Asbury hired, that targeted Plaintiff rather than the misconduct he reported. *Id.* ¶ 54. The letter states Asbury would investigate "rather than tak[e] immediate action" against Plaintiff, but it already had when Gage wrote him up for so-called "harassment." *Id.* ¶ 54.

Plaintiff fully cooperated with the investigation. He sat for two three-hour interviews and, as requested, provided documents, supplemental information, and a list of potential witnesses. *Id.* ¶ 56. Despite claiming her investigation was "independent," Lauro provided her findings to Asbury only and refused Plaintiff's request for a copy. *Id.* ¶ 55.

### 4.  Failure to Promote

On October 20, 2022, Infante announced that he was moving to Florida to become general manager of an Asbury dealership there. *Id.* ¶ 59. The Company immediately posted an opening for New Car Sales Director and, just days later, announced that Raymond Resch, Pre-Owned Sales Manager at Park Place Lexus in Grapevine, would fill it. *Id.* ¶ 59.

Plaintiff was permitted to apply and interview, but Gage gave him only a sham interview of less than 15 minutes. *Id.* ¶ 60.  Absent retaliation, Tupac would have received the promotion. *Id.* ¶ 63. As recently as March 2022—before Tupac's reports— Gage encouraged Tupac to stay in Arlington in anticipation of this Director opportunity instead of interviewing for a Sales Manager position in Dallas. *Id.* ¶ 63.

### 5.  The Termination

On November 14, 2022, Gage summoned Tupac to HR and terminated him for unspecified "misconduct." *Id.* ¶ 66. But the Company's true, retaliatory motive was unmistakable, given Chadwick's attempts to intimidate, Gage's animus, Lauro's strategic interviews, the write-up for "harassment," the failure to promote, and their proximity in time to Plaintiff's September 9, 2022 internal report to Asbury, his September 13, 2022 submission to the SEC, and his October 2022 disclosure that he was cooperating with the SEC. *Id.* ¶ 66.

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff filed an administrative complaint with OSHA on January 12, 2023, which is within 180 days of his November 14, 2022 termination in violation of the Act. Pursuant to a pilot program intended to speed final resolution of claims, Plaintiff asked OSHA to terminate its investigation and issue findings based on the investigation performed up to that time. On that limited record, OSHA was unable to conclude whether there is reasonable cause to believe a violation of the Act occurred, and it dismissed Plaintiff's complaint on April 18, 2023.

On May 18, 2023, Plaintiff timely filed objections to the findings and initiated an appeal with the Office of Administrative Law Judges. Plaintiff's appeal was docketed on May 31, 2023 and later set for hearing on February 22, 2024 before Administrative Law Judge Susan Hoffman with a pre-hearing conference set for February 1, 2024.

On January 13, 2024, after more than 210 days had passed without a final order from the Secretary of Labor, Plaintiff filed this litigation, seeking the Court's de novo review. *See* Pl.'s Orig. Compl. ¶¶ 7–12; *see also* 12 U.S.C. § 5567(c)(4)(D).

Pursuant to this Court's Standing Order, Defendants' counsel notified Plaintiff's counsel of Defendants' intent to file a motion to dismiss, providing a barebones explanation of its argument:

> It is our position that Plaintiff has failed to state a claim upon which relief can be granted because he fails to satisfy the prima facie elements of a Sarbanes-Oxley whistleblower claim. In particular, we contend that it was not objectively reasonable for Plaintiff to believe that Defendants committed

securities fraud or fraud against Asbury's shareholders.  Moreover, the Complaint's allegations are insufficient to rise above the speculative level and are conclusory.  Additionally, Plaintiff does not make any plausible allegation that the alleged misconduct he allegedly observed was committed to defraud Asbury shareholders.

Defendants' counsel did not disclose the crux of their reasoning—that Plaintiff observed only local misconduct, which does not rise to the level of securities fraud or fraud against shareholders, such that Plaintiff engaged in conduct protected by the anti-retaliation provisions of SOX.

Plaintiff filed notice of his intent to amend his original complaint and filed his First Amended Complaint on April 12, 2024. Contending the amended complaint is still deficient, Defendants moved to dismiss on April 26, 2024.

## STATEMENT OF THE ISSUES/STANDARD OF REVIEW

1. Whether reasonable minds could disagree about whether Plaintiff's belief that Asbury committed securities fraud or violated any rule or regulation of the SEC or any provision of federal law relating to fraud against shareholders was objectively reasonable, precluding the court from deciding the objective reasonableness of Plaintiff's belief as a matter of law. *See Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 477 (5th Cir. 2008).

2. Whether the Sarbanes-Oxley Act of 2002 requires Plaintiff to allege Asbury had an intent to defraud its shareholders to make a *prima facie* showing that Plaintiff engaged in activity protected by the Act.

3. Even if Plaintiff was required to allege an intent to defraud shareholders, whether Plaintiff sufficiently alleged such intent, such that he engaged in activity protected by the Act.

## ARGUMENT AND AUTHORITIES

To prevail on a SOX anti-retaliation claim, Plaintiff must plead and prove by a preponderance of the evidence that (1) he engaged in protected activity; (2) the employer knew it; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action. *Allen v. Admin. Review Bd.*, 514 F.3d 468, 475-476 (5th Cir. 2008). Defendants substantively challenge only the first element—whether Plaintiff engaged in activity protected under 18 U.S.C. 1514A.

### I. Plaintiff engaged in activity protected under SOX and reasonably believed Asbury had engaged in one or more of the six enumerated violations of law in 18 U.S.C. § 1514A.

SOX defines protected activity as:

> any lawful act done by the employee to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders . . . .

*Wallace v. Tesoro Corp.*, 796 F.3d 468, 474 (5th Cir. 2015) (quoting 18 U.S.C. § 1514A(a)). To receive protection under SOX, the employee must "provide

information or assist in an investigation that he reasonably believes relates to one or more of six categories of laws and regulations: four specific types of fraud, a federal offense that relates to fraud against shareholders, or a rule or regulation of the SEC." *Id.*

Courts evaluate an employee's reasonable belief that conduct violates one of the six categories under both an objective and a subjective standard. *See Allen v. Admin. Review Bd.*, 514 F.3d 468, 477 (5th Cir. 2008)). The objective standard asks examines whether the belief would be held by "a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Id.*

The Fifth Circuit has held that where reasonable minds can disagree about the reasonableness of an employee's belief, the question cannot be decided as a matter of law. *Id.* Nevertheless, Defendants ask the Court to do just that. Mem. of Law in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 11.

The key misstatements at issue are:

(1) that Clicklane is a "100% online" retail platform for automobile sales, Am. Compl. ¶ 15.

(2) consumers can complete cash transactions in a mere 8 minutes on Clicklane and financed transactions in only 14 minutes, *id.* ¶ 41; and

(3) Overreporting of Clicklane sales volume due to inclusion of in-store purchases in the Clicklane numbers, *id.* ¶¶ 22–24, 37.

Plaintiff, with his training and experience in car sales, was in a position to know that Clicklane is not 100% online because, as New Car Sales Manager in a Texas dealership, he knew that Texas requires wet signatures on paperwork necessary to buy cars. *Id.* ¶¶ 18–19, 21. Thus, purchasers completing their "paperwork" online through Clicklane are performing a futile act because, upon delivery of the vehicle, they must sign the actual paperwork, rendering Clicklane less than 100% online. For the same reasons, among others, customers generally cannot complete Clicklane transactions in between 8 and 14 minutes. It takes far longer and, again, as a sales manager, Plaintiff was in a position to know.  A reasonable person in Plaintiff's position could believe Asbury committed securities fraud by making false statements of material fact. *See Allen,* 514 F.3d at 477.

It doesn't matter that Plaintiff was a single employee at a single dealership. Defs.' Mem. at 1. He knows the process of selling cars inside and out and that knowledge made it apparent that Asbury's claims that Clicklane is 100% online and facilitates 8-14 minute transactions simply weren't true.

Those misstatements are material because Asbury made Clicklane the cornerstone of its growth strategy. Clicklane was expected generate 25% of the Company's annual revenue--$5 billion of $20 billion according to 2020 goals and $8 billion of $32 billion in the enhanced 2022 goals. Am. Compl. ¶¶ 17, 20.

Moreover, when Plaintiff submitted his tip to the SEC, the SEC took an immediate interest, and an investigator followed up to request more information. Am. Compl. ¶ 42. Plaintiff cooperated providing written answers to two rounds of the SEC's questions. *Id.* Defendants' argument that Plaintiff lacked a reasonable belief that Asbury engaged in one of the six enumerated activities would require the Court to impliedly determine that the SEC acted unreasonably in following up on Plaintiff's tip. If anything, the fact that the SEC found the tip worthy of its attention suggests Plaintiff's belief *is* reasonable as a matter of law.

## II.   Plaintiff need not allege that Asbury's conduct was committed with the intent to defraud Asbury's shareholders.

According to Defendants, the Fifth Circuit requires that an employee must reasonably believe that his or her employer acted with a mental state embracing an intent to deceive, manipulate, or defraud its shareholders when a plaintiff alleges Defendants' alleged misconduct constitutes a violation of provisions of federal law relating to fraud against shareholder as covered by § 1514A's sixth category. Defs.' Mem. at 21(citing Allen, 514 F.3d at 479–80). Because Plaintiff relies on the fourth and fifth categories—securities fraud and violations of SEC rules and regulations, the standard Defendants cite does not apply and, therefore, does not require dismissal.

## CONCLUSION AND PRAYER

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss and grant Plaintiff such other and further relief to which he may be entitled. However, if the Court grants the motion to dismiss, Plaintiff respectfully requests an opportunity to amend and add allegations regarding the visibility he had into the entire Park Place Group and how the Clicklane misclassifications were extreme and dealership-wide, among other things.

Word Count: 4,253

DATE: May 17, 2024                         Respectfully submitted,

_/s/ R. Kent Piacenti_
R. Kent Piacenti
Texas Bar No. 24083660
LAW OFFICE OF R. KENT PIACENTI,
PLLC
8350 N. Central Expy, Ste. 1900,
PMB 3169
Dallas, TX 75206
Telephone: 214-888-3639
Facsimile: 214-396-2025
kent@piacentilaw.com

_Attorney for Plaintiff Michael Tupac_