# **Exhibit 1**

Q1 Earning Announcement

9/13/22, 7:59 AM          Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E     Document 42-1     Filed 11/19/24     Page 2 of 76     PageID 915



ⓐ Back To Press Releases

Thu Apr 28 2022

# Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announces Update to Strategic Growth Plan

<u>View Printable Version »</u>

- *First quarter EPS of $10.38 per diluted share, up 117% over prior year*
- *First quarter adjusted EPS of $9.27 per diluted share (a non-GAAP measure), up 98% over prior year*
- *First quarter revenue increased 78% and gross profit increased 107% over prior year quarter; operating margin of 8.2% rose 200 bps year-over-year*
- *First quarter SG&A as a percentage of gross profit decreased 520 bps over prior year to 57.5%*
- *First quarter adjusted EBITDA (a non-GAAP measure) increased 139% to $336 million*
- *New $200 million share repurchase authorization*

DULUTH, Ga.--(BUSINESS WIRE)--Apr. 28, 2022-- Asbury Automotive Group, Inc. (NYSE: ABG) (the "Company"), one of the largest automotive retail and service companies in the U.S., reported record first quarter 2022 net income of $237.7 million ($10.38 per diluted share), an increase of 156% from $92.8 million ($4.78 per diluted share) in the prior year quarter.

"In the first quarter, our legacy Asbury and recently acquired stores contributed to the Company generating all-time record adjusted EBITDA, which increased 139% to $336 million. We are excited about our expanded dealership portfolio and our team members, all of whom have done an outstanding job. The strategic fit of the acquisitions we made in 2021 is clear and we believe that we are now on pace to generate $16 billion in revenue in 2022, a 63% increase over 2021. We have updated our strategic growth plan to reflect our new target of $32 billion in revenue in 2025. Our first quarter results reaffirm our belief that we can achieve our updated 2025 plan," said David Hult,

9/13/22, 7:59 AM     Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E     Document 42-1     Filed 11/19/24     Page 3 of 76     PageID 916



"We see tremendous opportunity ahead of us as we roll out Clicklane to our acquired dealerships and integrate Total Care Auto, Powered by Landcar, or TCA, into the legacy Asbury stores. We expect these actions, along with a more optimized dealership portfolio, will allow Asbury to expand its market share, increase productivity and improve the purchasing, servicing and ownership experience of our guests."

The financial measures discussed below include both GAAP and adjusted (non-GAAP) financial measures. Please see reconciliations for non-GAAP metrics included in the accompanying financial tables.

First quarter 2022 adjusted net income, a non-GAAP measure, increased 134% year-over-year to $212.2 million ($9.27 per diluted share) compared to adjusted net income of $90.7 million ($4.68 per diluted share) in first quarter 2021. Adjusted net income for first quarter 2022 excludes gains, net of tax, of $25.5 million ($1.11 per diluted share) related to a $33.1 million ($1.08 per diluted share) gain on the sale of four dealerships and a $0.9 million ($0.03 per diluted share) sale-leaseback real estate gain.

Net income for the first quarter 2021 was adjusted for the following pre-tax items: gain on legal settlements of $3.5 million ($0.14 per diluted share), gain on sale of real estate of $1.1 million ($0.03 per diluted share), and other real estate related charges of $1.8 million ($0.07 per diluted share).

**First Quarter 2022 Operational Summary**

**Total company vs. 1st Quarter 2021:**

- Revenue of $3.9 billion, an increase of 78%
- Gross profit increased 107%
- Gross margin increased 270 bps to 20.2%
- New vehicle unit volume increased 44%; new vehicle revenue increased 61%; gross profit increased 197%
- Used vehicle retail unit volume increased 63%; used vehicle retail revenue increased 100%; gross profit increased 102%
- Finance and insurance revenue increased 130%; gross profit increased 118%
- Parts and service revenue increased 92%; gross profit increased 70%
- SG&A as a percentage of gross profit fell to 57.5%, a decrease of 520 bps
- Operating income increased 135%; adjusted operating income increased 140%
- Operating margin increased 200 bps to 8.2%; adjusted operating margin increased 210 bps to 8.2%
- EPS increased 117% to $10.38; adjusted EPS increased 98% to $9.27

**Same store (dealership only) vs. 1st Quarter 2021:**

9/13/22, 7:59 AM
Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 4 of 76    PageID 917

**ASBURY**
AUTOMOTIVE GROUP

- Gross profit increased 23%
- Gross margin increased 310 bps to 20.5%
- New vehicle unit volume decreased 20%; new vehicle revenue decreased 10%; new vehicle gross profit increased 67%
- Used vehicle retail unit volume increased 6%; used vehicle retail revenue increased 32%; used vehicle retail gross profit increased 17%
- Finance and insurance revenue increased 26%; gross profit per unit increased 36%
- Parts and service revenue increased 14%; gross profit increased 10%; customer pay gross profit increased 16%

**Clicklane metrics:**

- Over 5,600 vehicles sold; 38% new, 62% used
- 92% of transactions were customers incremental to Asbury Automotive
- 43% of Clicklane sales had a trade-in
- 62% of trade-ins were reconditioned and sold to retail customers
- Total Front-End yield of $6,095, F&I yield of $2,291
- Conversion rate nearly double that of traditional internet leads
- 95% of deliveries within a 50-mile radius of an Asbury dealership

**Divestitures**

Year-to-date, the Company has completed seven planned divestitures, including four that closed in the first quarter, and received $327 million in proceeds.

**Liquidity and Leverage**

The Company generated $409 million in operating cash flow enabling the pay down of $374 million in debt and used vehicle floorplan during the first quarter. As of March 31, 2022, the Company had cash of $147 million (which excludes $138 million of cash at TCA), floorplan offset accounts of $27 million and availability under the used vehicle floorplan line and revolver of $632 million for a total of approximately $805 million in liquidity. The Company's adjusted net leverage ratio was 2.2x at quarter end compared to 2.7x at the end of 2021.

**Share Repurchase**

During the first quarter, the Company repurchased 1.1 million shares for $200.0 million, which completed the previously authorized $200.0 million share repurchase authorization. On April 27, 2022, Asbury's Board of Directors authorized a new common stock share repurchase authorization of up to $200.0 million. The shares may be purchased from time to time in the open market, in privately negotiated transactions or in other manners as permitted by federal securities laws and other legal and contractual requirements. The extent to which the Company repurchases its shares, the number

9/13/22, 7:59 AM    Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 5 of 76    PageID 918



return on competing uses of capital such as strategic dealership acquisitions and capital investments and other considerations. The program does not require the Company to repurchase any specific number of shares, and may be modified, suspended or terminated at any time without further notice.

**Corporate Responsibility Report**

The Company recently released its inaugural Corporate Responsibility Report on its website, asburyauto.com, to present our Environmental, Social and Governance ("ESG") commitments and related initiatives.

**2025 Strategic Growth Plan**

The Company provided an update to its 2025 Strategic Growth Plan within its first quarter 2022 investor presentation on its website and will provide commentary on it during its earnings call. Unless otherwise specified, information contained on our website is not incorporated into this press release or other documents we file with, or furnish to, the SEC.

**Earnings Call**

Additional commentary regarding the first quarter results will be provided during the earnings conference call on Thursday, April 28, 2022, at 10:00 a.m. ET.

The conference call will be simulcast live on the internet and can be accessed by logging onto www.asburyauto.com/company/investor-relations. A replay will be available on this site for 30 days.

In addition, live audio of the call will be accessible to the public by calling (888) 221-3881 (domestic) or (646) 828-8193 (international); confirmation code – 2312348. Callers should dial in approximately 5 to 10 minutes before the call begins.

A conference call replay will be available two hours following the call for seven days and can be accessed by calling (888) 203-1112 (domestic) or (719) 457-0820 (international); passcode – 2312348.

**About Asbury Automotive Group, Inc.**

Asbury Automotive Group, Inc. (NYSE: ABG), a Fortune 500 company headquartered in Duluth, GA, is one of the largest automotive retailers in the U.S. In late 2020, Asbury embarked on a five-year plan to increase revenue and profitability strategically through organic and acquisitive growth as well as their innovative Clicklane digital vehicle purchasing platform, with its guest-centric approach as Asbury's constant North Star. Asbury currently operates 148 new vehicle dealerships in 15 states, consisting of 198 franchises, representing 31 brands of vehicles, and 7 stand-alone used vehicle

9/13/22, 7:59 AM    Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 6 of 76    PageID 919



contracts and other vehicle protection products. Asbury offers an extensive range of automotive products and services, including new and used vehicles; parts and service, which includes vehicle repair and maintenance services, replacement parts and collision repair services; and finance and insurance products, including arranging vehicle financing through third parties and aftermarket products, such as extended service contracts, guaranteed asset protection debt cancellation and prepaid maintenance.

For additional information, visit www.asburyauto.com.

**Forward-Looking Statements**

This press release contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are statements other than historical fact, and may include statements relating to goals, plans, objectives, projections regarding Asbury's financial position, liquidity, results of operations, cash flows, leverage, market position and dealership portfolio, revenue enhancement strategies, operational improvements, projections regarding the expected benefits of Clicklane, management's plans, projections and objectives for future operations, scale and performance, integration plans and expected synergies from acquisitions, capital allocation strategy, business strategy and expectations of our management with respect to, among other things:

changes in general economic and business conditions, including increases in interest rates and rising fuel prices, any impact of COVID-19 on the automotive industry in general, the automotive retail industry in particular and our customers, suppliers, vendors and business partners; our relationships with vehicle manufacturers; our ability to maintain our margins; operating cash flows and availability of capital; capital expenditures; the amount of our indebtedness; the completion of any future acquisitions and divestitures; future return targets; future annual savings; general economic trends, including consumer confidence levels, interest rates, and fuel prices; and automotive retail industry trends. These statements are based on management's current expectations and beliefs and involve significant risks and uncertainties that may cause results to differ materially from those set forth in the statements. These risks and uncertainties include, among other things, our inability to realize the benefits expected from recently completed transactions; our inability to promptly and effectively integrate completed transactions and the diversion of management's attention from ongoing business and regular business responsibilities; our inability to complete future acquisitions or divestitures and the risks resulting therefrom; any impact from the COVID-19 pandemic on our industry and business, market factors, Asbury's relationships with, and the financial and operational stability of, vehicle manufacturers and other suppliers, acts of God, acts of war or other incidents and the shortage of semiconductor chips and other components, which may adversely impact supply from vehicle manufacturers and/or present retail sales challenges; risks associated with Asbury's indebtedness and our ability to comply with applicable covenants in our various financing agreements, or to obtain waivers of these covenants as necessary; risks related to competition in the automotive retail and

9/13/22, 7:59 AM    Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 7 of 76    PageID 920



other proceedings, and Asbury's ability to execute its strategic and operational strategies and initiatives, including its five-year strategic plan, Asbury's ability to leverage gains from its dealership portfolio, Asbury's ability to capitalize on opportunities to repurchase its debt and equity securities or purchase properties that it currently leases, and Asbury's ability to stay within its targeted range for capital expenditures. There can be no guarantees that Asbury's plans for future operations will be successfully implemented or that they will prove to be commercially successful.

These and other risk factors that could cause actual results to differ materially from those expressed or implied in our forward-looking statements are and will be discussed in Asbury's filings with the U.S. Securities and Exchange Commission from time to time, including its most recent annual report on Form 10-K and any subsequently filed quarterly reports on Form 10-Q. These forward-looking statements and such risks, uncertainties and other factors speak only as of the date of this press release. We undertake no obligation to publicly update any forward-looking statement, whether as a result of new information, future events or otherwise.

ASBURY AUTOMOTIVE GROUP, INC.

CONSOLIDATED STATEMENTS OF INCOME (In millions, except per share data)

(Unaudited)

|  | For the Three Months Ended March 31, | | % Change | |
| --- | --- | --- | --- | --- |
|  | 2022 | 2021 | | |
| REVENUE: | | | | |
| New vehicle | $ 1,855.6 | $ 1,151.7 | 61 | % |
| Used vehicle: | | | | |
| Retail | 1,216.9 | 607.5 | 100 | % |
| Wholesale | 134.0 | 83.4 | 61 | % |
| Total used vehicle | 1,350.9 | 690.9 | 96 | % |
| Parts and service | 501.9 | 262.0 | 92 | % |
| Finance and insurance | 203.4 | 88.3 | 130 | % |

9/13/22, 7:59 AM          Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E     Document 42-1     Filed 11/19/24     Page 8 of 76     PageID 921



| COST OF SALES: | | | | |
|---|---|---|---|---|
| New vehicle | 1,631.6 | 1,076.2 | 52 | % |
| Used vehicle: | | | | |
| Retail | 1,121.1 | 560.0 | 100 | % |
| Wholesale | 130.5 | 75.1 | 74 | % |
| Total used vehicle | 1,251.6 | 635.1 | 97 | % |
| Parts and service | 225.4 | 98.9 | 128 | % |
| Finance and insurance | 11.2 | — | — | % |
| TOTAL COST OF SALES | 3,119.8 | 1,810.2 | 72 | % |
| GROSS PROFIT | 792.0 | 382.7 | 107 | % |
| OPERATING EXPENSES: | | | | |
| Selling, general and administrative | 455.5 | 239.8 | 90 | % |
| Depreciation and amortization | 18.4 | 9.8 | 88 | % |
| Other operating income, net | (2.7 ) | (3.2 ) | (16 ) | % |
| INCOME FROM OPERATIONS | 320.8 | 136.3 | 135 | % |
| OTHER EXPENSES: | | | | |
| Floor plan interest expense | 2.6 | 2.9 | (10 ) | % |
| Other interest expense, net | 37.6 | 14.0 | 169 | % |
| Gain on dealership divestitures, net | (33.1 ) | — | — | % |
| Total other expenses, net | 7.1 | 16.9 | (58 ) | % |
| INCOME BEFORE INCOME TAXES | 313.7 | 119.4 | 163 | % |
| Income tax expense | 76.0 | 26.6 | 186 | % |

9/13/22, 7:59 AM          Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E          Document 42-1          Filed 11/19/24          Page 9 of 76          PageID 922



EARNINGS PER COMMON SHARE:

Basic—

| | | | |
|---|---|---|---|
| Net income | $ 10.43 | $ 4.81 | 117 % |

Diluted—

| | | | |
|---|---|---|---|
| Net income | $ 10.38 | $ 4.78 | 117 % |

WEIGHTED AVERAGE COMMON SHARES OUTSTANDING:

| | | |
|---|---|---|
| Basic | 22.8 | 19.3 |
| Restricted stock | — | 0.1 |
| Performance share units | 0.1 | — |
| Diluted | 22.9 | 19.4 |

ASBURY AUTOMOTIVE GROUP, INC.

Additional Disclosures-Consolidated (In millions)

(Unaudited)

| | March 31, 2022 | December 31, 2021 | Increase (Decrease) | % Change | |
|---|---|---|---|---|---|
| SELECTED BALANCE SHEET DATA | | | | | |
| Cash and cash equivalents | $ 284.3 | $ 178.9 | $ 105.4 | 59 | % |
| Inventory, net (a) | 701.1 | 718.4 | (17.3 ) | (2 | ) % |
| Total current assets | 1,813.9 | 1,929.4 | (115.5 ) | (6 | ) % |
| Floor plan notes payable (b) | 398.6 | 564.5 | (165.9 ) | (29 | ) % |
| Total current liabilities | 1,584.8 | 1,598.0 | (13.2 ) | (1 | ) % |

9/13/22, 7:59 AM Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 10 of 76    PageID 923

**ASBURY**
AUTOMOTIVE GROUP

| | | | | | | |
|---|---|---|---|---|---|---|
| Long-term debt (including current portion) (c) | $ 3,403.3 | $ 3,582.6 | $ (179.3 | ) | (5 | ) % |
| Shareholders' equity | 2,182.5 | 2,115.5 | 67.0 | | 3 | % |
| Total | $ 5,585.8 | $ 5,698.1 | $ (112.3 | ) | (2 | ) % |

_____

(a) Excludes $11.6 million and $24.1 million of Inventory classified as Assets held for sale as of March 31, 2022 and December 31, 2021, respectively

(b) Excluding $2.6 and $9.1 million of Floor plan notes payable classified as Liabilities associated with assets held for sale as of March 31, 2022 and December 31, 2021, respectively

(c) Excluding $3.3 million of Debt classified as Liabilities associated with assets held for sale as of March 31, 2022

| | March 31, 2022 | December 31, 2021 | March 31, 2021 |
|---|---|---|---|
| **Day Supply** | | | |
| New vehicle inventory | 10 | 8 | 34 |
| Used vehicle inventory | 28 | 34 | 27 |

_____

Days supply of inventory is calculated based on new and used inventory levels at the end of each reporting period and a 30-day historical cost of sales.

*Brand Mix - New Vehicle Revenue by Brand*

| | For the Three Months Ended March 31, | |
|---|---|---|
| | **2022** | **2021** |
| **Luxury** | | |

9/13/22, 7:59 AM    Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 11 of 76    PageID 924



| | | | |
|---|---|---|---|
| BMW | 3 | % | 5 | % |
| Acura | 2 | % | 4 | % |
| Land Rover | 1 | % | 3 | % |
| Porsche | 1 | % | 2 | % |
| Audi | 1 | % | 2 | % |
| Other luxury | 4 | % | 5 | % |
| Total luxury | 29 | % | 45 | % |
| **Imports** | | | | |
| Toyota | 18 | % | 12 | % |
| Honda | 10 | % | 15 | % |
| Nissan | 4 | % | 5 | % |
| Hyundai | 5 | % | 2 | % |
| Other imports | 4 | % | 4 | % |
| Total imports | 41 | % | 38 | % |
| **Domestic** | | | | |
| Chrysler, Dodge, Jeep, Ram | 18 | % | 6 | % |
| Ford | 8 | % | 6 | % |
| Chevrolet, Buick, GMC | 4 | % | 5 | % |
| Total domestic | 30 | % | 17 | % |
| **Total New Vehicle Revenue** | 100 | % | 100 | % |

9/13/22, 7:59 AM   Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 12 of 76    PageID 925



|  | 2022 | | 2021 | |
|---|---|---|---|---|
| **Revenue mix** | | | | |
| New vehicle | 47.4 | % | 52.5 | % |
| Used vehicle retail | 31.2 | % | 27.8 | % |
| Used vehicle wholesale | 3.4 | % | 3.8 | % |
| Parts and service | 12.8 | % | 11.9 | % |
| Finance and insurance | 5.2 | % | 4.0 | % |
| Total revenue | 100.0 | % | 100.0 | % |
| **Gross profit mix** | | | | |
| New vehicle | 28.3 | % | 19.7 | % |
| Used vehicle retail | 12.1 | % | 12.4 | % |
| Used vehicle wholesale | 0.4 | % | 2.2 | % |
| Parts and service | 34.9 | % | 42.6 | % |
| Finance and insurance | 24.3 | % | 23.1 | % |
| Total gross profit | 100.0 | % | 100.0 | % |

ASBURY AUTOMOTIVE GROUP, INC.

STATEMENTS OF INCOME-CONSOLIDATED (In millions)

(Unaudited)

|  | **For the Three Months Ended March 31,** | | **% Change** |
|---|---|---|---|
|  | **2022** | **2021** | |

9/13/22, 7:59 AM  Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 13 of 76    PageID 926

# ASBURY
AUTOMOTIVE GROUP

| | | | | |
|---|---|---|---|---|
| New vehicle | $1,855.6 | $1,151.7 | 61 | % |
| Used vehicle: | | | | |
| Retail | 1,216.9 | 607.5 | 100 | % |
| Wholesale | 134.0 | 83.4 | 61 | % |
| Total used vehicle | 1,350.9 | 690.9 | 96 | % |
| Parts and service | 501.9 | 262.0 | 92 | % |
| Finance and insurance | 203.4 | 88.3 | 130 | % |
| Total Revenue | 3,911.8 | 2,192.9 | 78 | % |
| **Gross profit** | | | | |
| New vehicle | $224.0 | $75.5 | 197 | % |
| Used vehicle: | | | | |
| Retail | 95.8 | 47.5 | 102 | % |
| Wholesale | 3.5 | 8.3 | (58 | ) % |
| Total used vehicle | 99.3 | 55.8 | 78 | % |
| Parts and service | 276.5 | 163.1 | 70 | % |
| Finance and insurance | 192.2 | 88.3 | 118 | % |
| Total gross profit | 792.0 | 382.7 | 107 | % |
| **Operating expenses** | | | | |
| Selling, general and administrative | 455.5 | 239.8 | 90 | % |
| **Operating metrics** | | | | |
| SG&A as a percentage of gross profit | 57.5 % | 62.7 % | (520) bps | |
| Adjusted SG&A as a percentage of gross profit | 57.5 % | 62.7 % | (520) bps | |

9/13/22, 7:59 AM    Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 14 of 76    PageID 927

**ASBURY**
AUTOMOTIVE GROUP

| | | | | | |
|---|---|---|---|---|---|
| Income from operations as a percentage of gross profit | 40.5 | % | 35.6 | % | 490 bps |
| Adjusted income from operations as a percentage of revenue | 8.2 | % | 6.1 | % | 210 bps |
| Adjusted income from operations as a percentage of gross profit | 40.4 | % | 34.9 | % | 550 bps |
| Finance and insurance average gross profit per unit | 2,481 | | 1,739 | | 43 % |
| Total Parts and service gross margin | 55.1 | % | 62.3 | % | (720) bps |
| Total gross profit margin | 20.2 | % | 17.5 | % | 270 bps |

ASBURY AUTOMOTIVE GROUP, INC.

STATEMENTS OF INCOME-DEALERSHIPS (In millions)

(unaudited)

| | For the Three Months Ended March 31, | | % Change |
|---|---|---|---|
| | **2022** | **2021** | |
| **Revenue** | | | |
| New vehicle | $1,855.6 | $1,151.7 | 61 % |
| Used vehicle: | | | |
| Retail | 1,216.9 | 607.5 | 100 % |
| Wholesale | 134.0 | 83.4 | 61 % |
| Total used vehicle | 1,350.9 | 690.9 | 96 % |
| Parts and service | 509.8 | 262.0 | 95 % |
| Finance and insurance, net | 177.9 | 88.3 | 101 % |
| Total Revenue | 3,894.2 | 2,192.9 | 78 % |

9/13/22, 7:59 AM    Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 15 of 76    PageID 928

**ASBURY**
AUTOMOTIVE GROUP

| | | | | |
|---|---|---|---|---|
| New vehicle | $224.0 | $76.6 | 191 | % |
| Used vehicle: | | | | |
| Retail | 95.8 | 47.5 | 102 | % |
| Wholesale | 3.5 | 8.3 | (58 | ) % |
| Total used vehicle | 99.3 | 55.8 | 78 | % |
| Parts and service | 280.2 | 163.1 | 72 | % |
| Finance and insurance, net | 177.9 | 88.3 | 101 | % |
| Total gross profit | 781.4 | 382.7 | 104 | % |
| **Unit sales** | | | | |
| New vehicle: | | | | |
| Luxury | 8,257 | 8,511 | (3 | ) % |
| Import | 20,678 | 14,377 | 44 | % |
| Domestic | 10,239 | 4,371 | 134 | % |
| Total new vehicle | 39,174 | 27,259 | 44 | % |
| Used vehicle retail | 38,306 | 23,519 | 63 | % |
| Used to new ratio | 97.8 % | 86.3 % | | |
| **Average selling price** | | | | |
| New vehicle | $47,368 | $42,250 | 12 | % |
| Used vehicle retail | 31,768 | 25,830 | 23 | % |
| **Average gross profit per unit** | | | | |
| New vehicle: | | | | |
| Luxury | $8,575 | $5,252 | 63 | % |
| Import | 4,618 | 1,259 | 267 | % |

9/13/22, 7:59 AM    Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 16 of 76    PageID 929

**ASBURY**
AUTOMOTIVE GROUP

| | | | | |
|---|---|---|---|---|
| Total new vehicle | 5,718 | 2,770 | 106 | % |
| Used vehicle retail | 2,501 | 2,020 | 24 | % |
| Finance and insurance | 2,296 | 1,739 | 32 | % |
| Front end yield (1) | 6,424 | 4,161 | 54 | % |
| **Gross margin** | | | | |
| New vehicle | 12.1 % | 6.6 % | 550 bps |
| Used vehicle retail | 7.9 % | 7.8 % | 10 bps |
| Parts and service | 55.0 % | 62.3 % | (730) bps |
| Total gross profit margin | 20.1 % | 17.5 % | 260 bps |
| **Operating expenses** | | | | |
| Selling, general and administrative | 462.1 | 239.8 | 93 | % |
| Adjusted Selling, general and administrative | 462.1 | 239.8 | 93 | % |
| SG&A as a percentage of gross profit | 59.1 % | 62.7 % | (360) bps |
| Adjusted SG&A as a percentage of gross profit | 59.1 % | 62.7 % | (360) bps |

_____

(1)  Front end yield is calculated as gross profit from new vehicles, used retail vehicles and finance and insurance (net), divided by combined new and used retail unit sales.

ASBURY AUTOMOTIVE GROUP, INC.

SAME STORE OPERATING HIGHLIGHTS-DEALERSHIPS (In millions)

(Unaudited)

**For the Three Months**

9/13/22, 7:59 AM    Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 17 of 76    PageID 930



**Revenue**

| | | | | |
|---|---|---|---|---|
| New vehicle | $ 1,028.4 | $ 1,137.3 | (10 | ) % |
| Used Vehicle: | | | | |
| Retail | 789.9 | 597.6 | 32 | % |
| Wholesale | 52.5 | 82.9 | (37 | ) % |
| Total used vehicle | 842.4 | 680.5 | 24 | % |
| Parts and service | 295.1 | 258.7 | 14 | % |
| Finance and insurance | 109.9 | 87.4 | 26 | % |
| Total revenue | $ 2,275.8 | $ 2,163.9 | 5 | % |

**Gross profit**

| | | | | |
|---|---|---|---|---|
| New vehicle | $ 124.5 | $ 74.4 | 67 | % |
| Used Vehicle: | | | | |
| Retail | 54.8 | 46.8 | 17 | % |
| Wholesale | 0.7 | 8.2 | (91 | ) % |
| Total used vehicle | 55.5 | 55.0 | 1 | % |
| Parts and service | 176.3 | 160.8 | 10 | % |
| Finance and insurance | 109.9 | 87.4 | 26 | % |
| Total gross profit | $ 466.2 | $ 377.6 | 23 | % |

**Unit sales**

| | | | | |
|---|---|---|---|---|
| New vehicle: | | | | |
| Luxury | 6,867 | 8,259 | (17 | ) % |
| Import | 11,638 | 14,377 | (19 | ) % |

9/13/22, 7:59 AM    Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 18 of 76    PageID 931

**ASBURY**
AUTOMOTIVE GROUP

| | | | | |
|---|---|---|---|---|
| Total new vehicle | 21,651 | 27,007 | (20 | ) % |
| Used vehicle retail | 24,597 | 23,175 | 6 | % |
| Used to new ratio | 113.6 % | 85.8 % | | |
| **Average selling price** | | | | |
| New vehicle | $47,499 | $42,111 | 13 | % |
| Used vehicle retail | 32,114 | 25,786 | 25 | % |
| **Average gross profit per unit** | | | | |
| New vehicle: | | | | |
| Luxury | $8,446 | $5,255 | 61 | % |
| Import | 4,365 | 1,266 | 245 | % |
| Domestic | 4,990 | 2,928 | 70 | % |
| Total new vehicle | 5,750 | 2,755 | 109 | % |
| Used vehicle retail | 2,228 | 2,019 | 10 | % |
| Finance and insurance | 2,376 | 1,742 | 36 | % |
| Front end yield (1) | 6,253 | 4,157 | 50 | % |
| **Gross margin** | | | | |
| Total new vehicle | 12.1 % | 6.5 % | 560 bps | |
| Used vehicle retail | 6.9 % | 7.8 % | (90) bps | |
| Parts and service | 59.7 % | 62.2 % | (250) bps | |
| Total gross profit margin | 20.5 % | 17.4 % | 310 bps | |
| **Operating expenses** | | | | |
| Selling, general and administrative | $269.5 | $237.0 | 14 | % |

9/13/22, 7:59 AM     Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E     Document 42-1     Filed 11/19/24     Page 19 of 76     PageID 932



| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SG&A as a percentage of gross profit | 57.8 | % | 62.8 | % | (500) bps |
| Adjusted SG&A as a percentage of gross profit | 57.8 | % | 62.8 | % | (500) bps |

------------------------------------------

Front end yield is calculated as gross profit from new vehicles, used retail vehicles and finance
(1) and insurance (net), divided by combined new and used retail unit sales.

ASBURY AUTOMOTIVE GROUP, INC.

SEGMENT REPORTING

(Unaudited)

| | Three Months Ended March 31, 2022 | | |
|---|---|---|---|
| | Dealerships | TCA After Eliminations | Total Company |
| | (In millions) | | |
| **Revenue** | | | |
| New | $ 1,855.6 | $ — | $ 1,855.6 |
| Used | 1,350.9 | — | 1,350.9 |
| Parts and service | 509.8 | (7.9 ) | 501.9 |
| Finance and insurance | 177.9 | 25.5 | 203.4 |
| Total revenue | 3,894.2 | 17.6 | 3,911.8 |
| **Cost of sales** | | | |
| New | 1,631.6 | — | 1,631.6 |
| Used | 1,251.6 | — | 1,251.6 |
| Parts and service | 229.6 | (4.2 ) | 225.4 |

9/13/22, 7:59 AM          Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E     Document 42-1     Filed 11/19/24     Page 20 of 76     PageID 933

**ASBURY**
AUTOMOTIVE GROUP

| | | | | |
|---|---|---|---|---|
| Total cost of sales | 3,112.8 | 7.0 | | 3,119.8 |
| **Gross profit** | | | | |
| New | 224.0 | — | | 224.0 |
| Used | 99.3 | — | | 99.3 |
| Parts and service | 280.2 | (3.7 | ) | 276.5 |
| Finance and insurance | 177.9 | 14.3 | | 192.2 |
| Total gross profit | 781.4 | 10.6 | | 792.0 |
| **Selling, general and administrative** | 462.1 | (6.6 | ) | 455.5 |
| **Income from operations** | 304.9 | 15.9 | | 320.8 |

ASBURY AUTOMOTIVE GROUP INC.

Supplemental Disclosures

(Unaudited)

**Non-GAAP Financial Disclosure and Reconciliation**

In addition to evaluating the financial condition and results of our operations in accordance with GAAP, from time to time management evaluates and analyzes results and any impact on the Company of strategic decisions and actions relating to, among other things, cost reduction, growth, and profitability improvement initiatives, and other events outside of normal, or "core," business and operations, by considering certain alternative financial measures not prepared in accordance with GAAP. These measures include "Pro forma adjusted leverage ratio," "Adjusted income from operations," "Adjusted net income," "Adjusted operating margins," "Adjusted EBITA" and "Adjusted diluted earnings per share ("EPS")." Further, management assesses the organic growth of our revenue and gross profit on a same store basis. We believe that our assessment on a same store basis represents an important indicator of comparative financial performance and provides relevant information to assess our performance at our existing locations. Same store amounts consist of information from dealerships for identical months in each comparative period, commencing with the first month we owned the dealership. Additionally, amounts related to divested dealerships are excluded from each comparative period. Non-GAAP measures do not have definitions under GAAP and may be defined differently by and not be comparable to similarly titled measures used by other

9/13/22, 7:59 AM  Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 21 of 76    PageID 934



calculated in accordance with GAAP. Management cautions investors not to place undue reliance on such non-GAAP measures, but also to consider them with the most directly comparable GAAP measures. In their evaluation of results from time to time, management excludes items that do not arise directly from core operations, or are otherwise of an unusual or non-recurring nature. Because these non-core, unusual or non-recurring charges and gains materially affect Asbury's financial condition or results in the specific period in which they are recognized, management also evaluates, and makes resource allocation and performance evaluation decisions based on, the related non-GAAP measures excluding such items. In addition to using such non-GAAP measures to evaluate results in a specific period, management believes that such measures may provide more complete and consistent comparisons of operational performance on a period-over-period historical basis and a better indication of expected future trends. Management discloses these non-GAAP measures, and the related reconciliations, because it believes investors use these metrics in evaluating longer-term period-over-period performance, and to allow investors to better understand and evaluate the information used by management to assess operating performance.

The following tables provide reconciliations for our non-GAAP metrics:

| | For the Three Months Ended | | For the Twelve Months Ended | |
|---|---|---|---|---|
| | March 31, 2022 | March 31, 2021 | March 31, 2022 | December 31, 2021 |
| | (Dollars in millions) | | | |
| Adjusted leverage ratio: | | | | |
| Long-term debt (including current portion and held for sale) | | | $3,406.6 | $3,582.6 |
| Cash and floor plan offset | | | (310.9  ) | (272.9  ) |
| TCA restricted cash | | | 137.7 | 127.3 |
| Availability under our used vehicle revolving floor plan facility | | | (192.8  ) | (20.6  ) |
| Adjusted long-term net debt | | | $3,040.6 | $3,416.4 |

9/13/22, 7:59 AM    Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 22 of 76    PageID 935



Calculation of earnings before interest, taxes, depreciation and amortization ("EBITDA"):

| | | | | |
|---|---|---|---|---|
| Net Income | $ 237.7 | $ 92.8 | $ 677.3 | $ 532.4 |
| Depreciation and amortization | 18.4 | 9.8 | 50.5 | 41.9 |
| Income tax expense | 76.0 | 26.6 | 214.7 | 165.3 |
| Swap and other interest expense | 37.6 | 14.0 | 118.2 | 94.5 |
| Earnings before interest, taxes, depreciation and amortization ("EBITDA") | $ 369.7 | $ 143.2 | $ 1,060.7 | $ 834.1 |

Non-core items - expense (income):

| | | | | |
|---|---|---|---|---|
| Gain on dealership divestitures | $ (33.1 ) | $ — | $ (41.0 ) | $ (8.0 ) |
| Legal settlements | — | (3.5 ) | — | (3.5 ) |
| Gain on sale of real estate | (0.9 ) | (1.1 ) | (1.7 ) | (1.9 ) |
| Professional fees associated with acquisitions | — | — | 4.9 | 4.9 |
| Real estate-related charges | — | 1.8 | 0.3 | 2.1 |
| Total non-core items | (34.0 ) | (2.8 ) | (37.5 ) | (6.4 ) |
| Adjusted EBITDA | $ 335.7 | $ 140.4 | $ 1,023.2 | $ 827.7 |
| Pro forma impact of acquisition and divestitures on EBITDA | | | $ 330.7 | $ 440.4 |
| Pro forma Adjusted EBITDA | | | $ 1,353.9 | $ 1,268.1 |

9/13/22, 7:59 AM    Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 23 of 76    PageID 936

**ASBURY**
AUTOMOTIVE GROUP

Pro forma Adjusted net leverage ratio                                2.2        2.7

### Three Months Ended March 31, 2022

| | GAAP | Gain on Divestiture | Real estate related gain | Income tax effect | Non-GAAP adjusted |
|---|---|---|---|---|---|
| Selling, general and administrative | $455.5 | — | — | — | $455.5 |
| Income from operations | 320.8 | — | (0.9 ) | — | 319.9 |
| Net income | 237.7 | (33.1 ) | (0.9 ) | 8.5 | 212.2 |
| Weighted average common share outstanding - diluted | 22.9 | | | | 22.9 |
| Diluted EPS | $10.38 | (1.44 ) | (0.04 ) | 0.37 | $9.27 |
| SG&A as a percent of gross profit | 57.5 % | | | | 57.5 % |
| Income from operations as a percentage of revenue | 8.2 % | | | | 8.2 % |

***Dealerships:***

| | GAAP | Gain on Divestiture | Real estate related gain | Income tax effect | Non-GAAP adjusted |
|---|---|---|---|---|---|
| Selling, general and administrative | $462.1 | $ — | $— | $ — | $462.1 |
| SG&A as a percent of gross profit | 59.1 % | | | | 59.1 % |

9/13/22, 7:59 AM    Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E    Document 42-1    Filed 11/19/24    Page 24 of 76    PageID 937

**ASBURY**
AUTOMOTIVE GROUP

| | GAAP | Legal settlements | Real estate related gain | Real estate related charges | Income tax effect | Non-GAAP adjusted |
|---|---|---|---|---|---|---|
| Selling, general and administrative | $ 239.8 | $ — | $ — | $ — | $ — | $ 239.8 |
| Income from operations | 136.3 | (3.5  ) | (1.1  ) | 1.8 | — | 133.5 |
| Net income | $ 92.8 | (3.5  ) | (1.1  ) | 1.8 | 0.7 | 90.7 |
| Weighted average common share outstanding - diluted | 19.4 | | | | | 19.4 |
| Diluted EPS | $ 4.78 | (0.18  ) | (0.05 ) | 0.09 | 0.04 | $ 4.68 |
| SG&A as a percent of gross profit | 62.7  % | | | | | 62.7  % |
| Income from operations as a percentage of revenue | 6.2    % | (0.1    ) % | —    % | —    % | —    % | 6.1    % |

**_Dealerships:_**

| | GAAP | Legal settlements | Real estate related gain | Real estate related charges | Income tax effect | Non-GAAP adjusted |
|---|---|---|---|---|---|---|
| Selling, general and administrative | $ 239.8 | $ — | $ — | $ — | $ — | $ 239.8 |
| SG&A as a percent of gross profit | 62.7  % | | | | | 62.7  % |

View source version on businesswire.com:

https://www.businesswire.com/news/home/20220428005084/en/

Karen Reid

9/13/22, 7:59 AM          Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E     Document 42-1     Filed 11/19/24     Page 25 of 76     PageID 938



Ir@asburyauto.com

Source: Asbury Automotive Group, Inc.



2905 Premiere Parkway
Suite 300
Duluth, GA 40097 USA

## Shop

Browse Inventory

Buy Online with Clicklane

Find a Dealership

## Sell/Trade

Clicklane Appraisal

## Service

Schedule Service

Maintenance Intervals

## Careers

Browse Open Positions

Employee Benefits

---

Copyright © 2022 Asbury Automotive Group. All Rights Reserved.

Privacy Policy     Logo & Branding Guidelines     Employee Sandbox

9/13/22, 7:59 AM          Asbury Automotive Group Reports All-Time Record EPS of $10.38, for First Quarter 2022, up 117% Over Prior Year, and Announc…

Case 3:24-cv-00104-E     Document 42-1     Filed 11/19/24     Page 26 of 76     PageID 939



# **Exhibit 2**

Clicklane Management Process (Jan. 21, 2022)



Approved by: Sales Management
Approval Date: 01/21/2022

# Clicklane Management Process

## Purpose and Scope

The purpose of this process is to create consistency and engagement with the Clicklane sales process and client experience. There are three primary areas of focus that must be adhered to in order for the deal to qualify as a Clicklane deal.

- *Initiation and inquiry from the client, and application and purchase completed online*
- *Initiation from the SEM, and process completed in-store with client present*
- *Utilization as a showroom sales tool with SEM and client, or via digital tablet by the client*

## Responsibilities (Who's Accountable)

- Sales/eCommerce Managers
- Internet Sales Experience Managers
- Sales Experience Managers (SEM)

## Process

I. **Initiation and inquiry from the client, and application and purchase completed online**
   a. These leads will be managed by the Internet Sales Team through the Gubagoo Chat Client.
   b. All leads will be followed up on specifically through the Gubagoo tool and at no time should the client be pulled from the Clicklane process in order to maintain the digital sales experience. Management should be through the Gubagoo chat tool exclusively.
   c. Response time on these leads should be equal to, or better than our digital lead sources as these leads are time sensitive and clients may need assistance in the process.
   d. Clients that do not live in the immediate market should be directed to purchase the vehicle, or complete a majority through the Clicklane process online. SEM should send the Clicklane link to the client through DealerSocket and encourage the client to complete the deal there and upload all documents.
      i. **NOTE: If the client is paying cash, leasing, or placing a deposit on the vehicle, please have them go through the process, CHOOSE CASH > and once they arrive at the option to 'Complete Documents Online' or 'Sign In-Store', have them choose 'Sign In-Store' and send them the deposit link through the normal deposit process.**

II. **Initiation from the SEM, and process completed in-store with client present**
   a. Client is not present in the store and has agreed to purchase the vehicle.
   b. SEM will explain the deposit process that will be utilized through the Clicklane system.
   c. SEM will send the Clicklane link on the selected vehicle (if available) and have the client choose the appropriate finance or cash option in the Clicklane system.
      i. *NOTE: If the client is leasing the vehicle through MBFS, or is concerned about the number of inquiries their credit will be impacted by, have the client choose the 'CASH' option and place a deposit on the unit.*
   d. Once the client arrives at the dealership, the SEM will pull up the client folder in Gubagoo and complete the transaction and financial selections with the client present.
   e. Further direction will be given by the Sales Manager on how to proceed or additional items that will be needed.

*Park Place*
MOTORCARS
ARLINGTON

Approved by: Sales Management
Approval Date: 01/21/2022

III.  **Utilization as a showroom sales tool with SEM and client, or via digital tablet by the client**
   a.  **SCENARIO 1** - If the client has chosen a vehicle and is located at the dealership to finalize the purchase and the SEM is unavailable, an no other SEM can assist, the SEM should pull up the vehicle on a digital tablet (iPad) and prep the unit for the Clicklane process. The SEM should explain to the client our Digital Retail Tool (Clicklane) and have them start the process for the credit application, finance options, and product selections. Once available, the SEM can complete the process through Clicklane for the client convenience.
   b.  **SCENARIO 2** – The SEM has confirmed the vehicle selection from the client. SEM will pull up the vehicle from the website and start the desking process in Clicklane with the client present. SEM will walk the client through the Clicklane process and explain to them the convenience of our digital retail tool to create awareness and engagement.
   c.  Both scenarios are only if the client is in the dealership and has gone through the sales process and is ready to move forward.

IV.  All deals will not be Clicklane eligible and should be treated as a form of convenience for clients in the dealership, and as the best purchase option for clients that are not in the market area. We should encourage the utilization of the tool for clients, and engage with the management team to manage the process throughout.

**END OF PROCESS**

# **Exhibit 3**

Email from K. Piacenti to D. Calloway (Sept. 14, 2022)

## Kent Piacenti

| | |
|---|---|
| **From:** | Kent Piacenti |
| **Sent:** | Wednesday, September 14, 2022 7:07 PM |
| **To:** | Dean Calloway |
| **Cc:** | Kent Piacenti |
| **Subject:** | RE: 2022-07-18 Letter from R. Kent Piacenti to Jed Milstein re: Michael Tupac |
| **Attachments:** | Clicklane Management Process.docx |
| | |
| **Categories:** | Filed to Clio |

Dean,

I'm disappointed that we did not speak yesterday as planned and that I didn't hear from you today either. I hope I did not overlook an email from you setting a time for the call. Regardless, let's please reschedule. How about tomorrow at 3 p.m. ET or Friday at 11 a.m. ET?

In the meantime, I have additional information to share. First, further to the Clicklane issues, please find attached the process in place at Park Place Arlington. As you can see, it is official policy there to steer customers who were not originated online into Clicklane deals.

Second, it appears Malcolm is regularly giving sweetheart deals to his friends and contacts at great cost to the Company and contrary to its policies and ethical rules. Just this week, the dealership substantially overvalued trade-ins for three of Malcolm's friends (deal numbers 957228, 957231, 957233), which of course leads to decreased profit and even losses when the inflated trade-ins are sold. Some recent examples of such losses include deal numbers 957064 and 957142.

I understand there are many, many more examples. Michael is willing to speak with you or others in the Company—with me present--to help it determine the scope of the problem. But the Company need only ask Roderick Infante, Bobby Vance, Madlen Hamud, Diki Terry, or any of the Sales Experience Managers what's going on, and I'm confident they will confirm the information we have provided and very likely provide much more (including about Clicklane, too).

Michael likes his job and cares about the Company. The more I've worked with him the clearer it has become what an asset he is to the Company. He has notified the Company of substantial risks to its continuing success at great personal risk. This is an employee Asbury should want to hold on to—celebrate in fact. But to be honest, the Open Door Policy has felt more like the Door-in-the-Face Policy. The legal department and executive management need to step in to address Malcolm's conduct, including the conduct apparently aimed at Michael's near-term termination. Although we had previous concerns that Roderick was also determined to terminate Michael, we now suspect he was merely acting at Malcolm's direction. I presume the Company's anti-retaliation investigation will sort that out. At any rate, I would appreciate knowing what the Company's next steps are and in particular when it expects to conclude that investigation.

Finally, to the extent the Company deems it best to look into these matters before informing Malcolm of them, it may wish to consider also waiting to tell Tony Carimi, Park Place's Managing Director. I understand Tony and Malcolm are close and suspect there's a chance information Tony receives may make its way to Malcolm.

Thanks,

R. Kent Piacenti
Law Office of R. Kent Piacenti, PLLC
8350 N. Central Expy, Suite 1900
Dallas, TX 75206
Tel:  214-888-3639
Fax: 214-396-2025
kent@piacentilaw.com

---

**From:** R. Kent Piacenti <kent@piacentilaw.com>
**Sent:** Monday, September 12, 2022 10:33 AM
**To:** Dean Calloway <dcalloway@asburyauto.com>
**Cc:** R. Kent Piacenti <kent@piacentilaw.com>
**Subject:** RE: 2022-07-18 Letter from R. Kent Piacenti to Jed Milstein re: Michael Tupac

Thanks. Tomorrow I am available for a call between 10:30 a.m. and 2:30 p.m. ET. Please let me know a time that works for you. Below I've included some initial thoughts in response to your comments.

---

**From:** Dean Calloway <dcalloway@asburyauto.com>
**Sent:** Friday, September 9, 2022 3:26 PM
**To:** R. Kent Piacenti <kent@piacentilaw.com>
**Subject:** RE: 2022-07-18 Letter from R. Kent Piacenti to Jed Milstein re: Michael Tupac

Kent,

We can discuss on Tuesday.  I note, however, my specific disagreement with a number of the items raised in your prior correspondence. Among other things:

1.  Plano Position – Michael did apply for a transfer a few months back, but our understanding is that the retaliatory discipline described in our letter has since disqualified him from applying through the normal process. To be eligible, an Asbury employee must not have had "an employee counseling or corrective action within six months." I assume that description includes the discipline he received, but please let me know if I am mistaken and he in fact qualifies. Additionally, he needs approval from his General Manager, and it's unclear whether Malcolm would give it. This situation highlights the consequences of the improper discipline and the reasons we have asked the Company to rescind the discipline.

I am puzzled by your assertion that you understood that Michael was "disqualified . . . from applying through the normal process," as I specifically informed you that "[h]e just needs to follow the typical application process for jobs at other dealerships."

When you said Michael needed to follow the typical application process, you didn't mention that the typical application process requires GM approval and excludes those who have had an employee counseling or corrective action within 6 months. Nor did you say that Michael was eligible to apply despite those requirements. It's still unclear whether Michael meets the requirements or is being exempted from them. I understand that, unfortunately, the positions were filled without Michael being considered. To whatever extent this result was a misunderstanding, it could have been cleared up while the positions were open had we received a timely response to my August 29, 2022 email.

2.  ADA Accommodation – I understand Michael hasn't heard about the accommodation from Ms. Waugh yet, but I assume he will soon. Assuming the accommodation works in practice as intended, it should be sufficient to address our current concerns regarding limitations during work.

Ms. Waugh is in the process of notifying Mr. Tupac personally.  As I conveyed to you previously, however, his accommodation has been approved.

3.  FMLA – Do you know what the hold up is on approval of the intermittent FMLA leave?  On August 2, Ms. Waugh said: "Once Unum receives your healthcare provider's certification form, we will review it and let you know if your condition qualifies under the FMLA.  We assume the paperwork will provide the necessary information and we will be able to promptly approve your request for intermittent FMLA leave." I believe Unum received the certification that same day, which means it has been nearly a month since the Company has had the information it needs. If there is something more needed, please let me know. Regarding call-outs, Michael will follow the procedure, but what should he do if he cannot reach his supervisor prior to the time he is scheduled to be working? I believe the handbook says members must personally notify their supervisor of absences and tardiness and that emails, texts, and voicemails are not enough, but it doesn't explain how employees can comply with the policy if they're unable to personally reach a supervisor in time. Is as soon as possible sufficient, even if it's after the time he was scheduled to work?

I am not sure if Michael has shared the information he received with you, but he has been advised that sufficient documentation has been received, and that approval of his request for leave under FMLA will be confirmed as of the first day of his qualifying leave.  In other words, the process for approval of his FMLA request for intermittent leave will occur when he requests a day of intermittent leave to address his condition.  Michael should report to Unum the date of his first absence from work, when it occurs.   According to Unum: "A determination of eligibility will be made at that time and [he] will receive an updated notice of [his] leave status."

I've seen the notice from Unum, but Ms. Waugh said the Company would promptly decide whether Michael's condition qualifies for FMLA leave once it had the medical certification, and it has not done so. Moreover, you said that if it does qualify, then certain past absences would be reclassified. The determination, then, does not need to await a future absence, because right now the proper classification of those earlier absences is unresolved. In fact, the determination should have been made months ago, because the Company had an obligation to notify Michael of his potential FMLA eligibility within five business days of learning facts sufficient to suggest eligibility. I understand there is disagreement about what Malcolm and Roderick knew, but we are confident the evidence will demonstrate they had sufficient knowledge to trigger the notification requirement.


Dean A. Calloway
Associate General Counsel

**Asbury Automotive Group**
2905 Premiere Parkway, Suite 300
Duluth, GA  30097
Telephone: 770.418.8228 (direct)
dcalloway@asburyauto.com

CONFIDENTIALITY NOTICE: This e-mail and any attachments are for the exclusive and confidential use of the intended recipient.  If you received this in error, please do not read, distribute, or take action in reliance upon this message. Instead, please notify us immediately by return e-mail and promptly delete this message and its attachments from your computer system.  We do not waive attorney-client privilege or application of the work product doctrine by the transmission of this message.

**From:** R. Kent Piacenti [mailto:kent@piacentilaw.com]
**Sent:** Friday, September 9, 2022 12:25 AM
**To:** Dean Calloway <dcalloway@asburyauto.com>
**Cc:** R. Kent Piacenti <kent@piacentilaw.com>
**Subject:** RE: 2022-07-18 Letter from R. Kent Piacenti to Jed Milstein re: Michael Tupac

CAUTION: This email originated from outside of Asbury. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dean,

It's been nearly two months since my July 18, 2022 letter, nearly a month since our August 12 call, and over a week since my email below. To my knowledge, none of the issues I raised has been meaningfully addressed—much less resolved—and the assurances we've been given regarding the supposed investigation and Mr. Tupac's FMLA and ADA rights have not panned out. Moreover, on at least two occasions, I flagged the need to talk about certain accounting and compliance concerns, but the Company has avoided the conversation. In the meantime, the same supervisors that have illegally retaliated against Mr. Tupac have given him more and more duties, while newly micromanaging him—in an apparent attempt to document manufactured shortcomings and terminate him or otherwise constructively discharge him—while the improper discipline we have asked the company to rescind blocks him from seeking transfer to another store. Most recently, Mr. Gage unnecessarily unwound a deal in contravention of industry norms, harming the client relationship and exposing Asbury to litigation and financial risk, for no apparent reason other than to harm Mr. Tupac.

As for the compliance concerns (which I had planned at first to address by phone), Park Place Arlington—at the express direction of Mr. Gage and Mr. Infante—is improperly booking sales that occurred early in a month in the previous month for the purpose of hitting the store's goals. Store management also regularly manipulates the customer satisfaction index scores by effectively trading customers free equipment for a redo on their customer satisfaction surveys.

Most concerning, there appears to be a coordinated effort among at least the Park Place dealerships to reclassify sales from other channels as Clicklane sales to improperly pump up the sales volume attributable to Clicklane. I am unaware of any reason to think such conduct is limited to the Park Place brand. Given recent SEC filings and investor presentations, there's a substantial likelihood statements made about Clicklane and the Company's current and anticipated financial condition violate Section 10(b) of the Exchange Act and Rule 10b-5.

Let's please find a time to talk Monday or Tuesday to discuss how the company will address the concerns we have raised, or Mr. Tupac will be forced to consider next steps and potential remedies.


R. Kent Piacenti
Law Office of R. Kent Piacenti, PLLC
8350 N. Central Expy, Suite 1900
Dallas, TX 75206
Tel:  214-888-3639
Fax: 214-396-2025
kent@piacentilaw.com

---

**From:** R. Kent Piacenti
**Sent:** Monday, August 29, 2022 5:57 PM
**To:** Dean Calloway <dcalloway@asburyauto.com>
**Cc:** R. Kent Piacenti <kent@piacentilaw.com>
**Subject:** RE: 2022-07-18 Letter from R. Kent Piacenti to Jed Milstein re: Michael Tupac

Dean—thanks for following up. Here are some thoughts:

- Plano Position – Michael did apply for a transfer a few months back, but our understanding is that the retaliatory discipline described in our letter has since disqualified him from applying through the normal process. To be eligible, an Asbury employee must not have had "an employee counseling or corrective action within six months." I assume that description includes the discipline he received, but please let me know if I am mistaken and he in fact qualifies. Additionally, he needs approval from his General Manager, and it's unclear whether Malcolm would give it. This situation highlights the consequences of the improper discipline and the reasons we have asked the Company to rescind the discipline.

- ADA Accommodation – I understand Michael hasn't heard about the accommodation from Ms. Waugh yet, but I assume he will soon. Assuming the accommodation works in practice as intended, it should be sufficient to address our current concerns regarding limitations during work.

- FMLA – Do you know what the hold up is on approval of the intermittent FMLA leave?  On August 2, Ms. Waugh said: "Once Unum receives your healthcare provider's certification form, we will review it and let you know if your condition qualifies under the FMLA.  We assume the paperwork will provide the necessary information and we will be able to promptly approve your request for intermittent FMLA leave." I believe Unum received the certification that same day, which means it has been nearly a month since the Company has had the information it needs. If there is something more

needed, please let me know. Regarding call-outs, Michael will follow the procedure, but what should he do if he cannot reach his supervisor prior to the time he is scheduled to be working? I believe the handbook says members must personally notify their supervisor of absences and tardiness and that emails, texts, and voicemails are not enough, but it doesn't explain how employees can comply with the policy if they're unable to personally reach a supervisor in time. Is as soon as possible sufficient, even if it's after the time he was scheduled to work?

Finally, when we spoke, I was unable to describe the accounting/compliance concerns before you needed to end the call. Is there a time in the coming days I could discuss those with you by phone?

Thanks,

R. Kent Piacenti
Law Office of R. Kent Piacenti, PLLC
8350 N. Central Expy, Suite 1900
Dallas, TX 75206
Tel:  214-888-3639
Fax: 214-396-2025
kent@piacentilaw.com

---

**From:** Dean Calloway <dcalloway@asburyauto.com>
**Sent:** Wednesday, August 24, 2022 9:54 AM
**To:** R. Kent Piacenti <kent@piacentilaw.com>
**Subject:** RE: 2022-07-18 Letter from R. Kent Piacenti to Jed Milstein re: Michael Tupac

Kent – I am following up on our August 12 call and your email (below) about a Pre-Owned Sales Director Position in Plano.

- First, with respect to the Plano position, if Mr. Tupac is interested in this position, he is welcome to apply.  He just needs to follow the typical application process for jobs at other dealerships.  That process calls for Mr. Tupac to first submit his internal application through ICIMs. I understand he is familiar with this process, as he has previously used the system.  Once Michael has submitted his resume, that dealership will review his qualifications and determine if it believes he is qualified for the job and, if so, if his qualifications warrant an interview when compared to other candidates being considered.  If he is asked to interview, someone in that dealership will reach out to Michael to arrange the interview.

- Second, I understand that Michael has asked that, during a flare-up of his HS, he be allowed an exception to the normal dress code that would apply to him so he can wear more comfortable clothing that is more conducive to dealing with the flare-up than the typical business attire.  Assuming the clothing still fits within the range of clothing that is generally appropriate for a business environment, we have no issues at all with providing Michael an exception to the normal expected dress code during a flare-up so he can wear more comfortable clothing.  We would just ask that he notify his HR Manager Jordan Hunter or HR Director Elisa Waugh when he has that need.  Ms. Waugh will communicate this accommodation to Michael.

- Third, assuming Michael's condition is approved as a serious health condition under the FMLA, any absences related to his condition will be covered by the FMLA (so long as he has not exhausted his FMLA leave bank).  While there is disagreement as to what his managers knew about why he previously missed time, assuming Michael's HS condition qualifies under FMLA and to the extent he missed work because of an HS-related issue, we will retroactively designate FMLA for such missed time, and will confirm that no disciplinary action covers the three sick days you mentioned in your July 18, 2022 letter.  Also, if there are other days where he was out for an HS-related issue and he claims he was disciplined for missing work on those days, please email me those dates.  I do not believe the FMLA process has been completed, however, and these prospective steps are contingent upon his condition being approved for FMLA.  Regardless, we expect Michael to follow the call-out procedure when he is going to miss work because of an HS-related issue, whether Michael is experiencing an HS flare-up or is dealing with some other illness -- we ask that he notify his manager by telephone as soon as possible once he determines he cannot make it.

We still are reviewing the other concerns raised in your July 18, 2022 letter and will follow up with you once we complete that review.

Please let me know if there is any additional item we need to discuss.

Dean A. Calloway
Associate General Counsel
**Asbury Automotive Group**
2905 Premiere Parkway, Suite 300
Duluth, GA  30097
Telephone: 770.418.8228 (direct)
dcalloway@asburyauto.com

CONFIDENTIALITY NOTICE: This e-mail and any attachments are for the exclusive and confidential use of the intended recipient.  If you received this in error, please do not read, distribute, or take action in reliance upon this message. Instead, please notify us immediately by return e-mail and promptly delete this message and its attachments from your computer system.  We do not waive attorney-client privilege or application of the work product doctrine by the transmission of this message.

---

**From:** R. Kent Piacenti [mailto:kent@piacentilaw.com]
**Sent:** Thursday, August 18, 2022 2:20 PM
**To:** Dean Calloway <dcalloway@asburyauto.com>
**Subject:** RE: 2022-07-18 Letter from R. Kent Piacenti to Jed Milstein re: Michael Tupac

CAUTION: This email originated from outside of Asbury. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Dean,

Thanks again for your time last week. I'm writing to follow up because today Park Place posted a Pre-Owned Sales Director Position in Plano:

https://www.indeed.com/viewjob?jk=57cf22e74ce1cbb6&from=socialmediatagsbigj&from=mobRdr&utm_source=%2Fm%2F&utm_medium=redir&utm_campaign=dt

Michael would like to be considered. I understand he has worked as Sales Manager for both new and pre-owned cars in the past and that the responsibilities are essentially the same. A transfer seems like a great opportunity for a "reset" for both store management in Arlington, where I've heard things have been noticeably tense lately, and Michael in Plano. Freed from the distraction of past friction, I believe the move would translate to an even better client experience in both locations and ultimately more sales.

I also recall that you anticipated more information on the status of the review prompted by my letter and a decision on the request for intermittent FMLA leave. Any update on those matters is much appreciated. I'm generally available by phone today after 4 p.m. CT/5 p.m. ET and tomorrow other than 11:30 a.m. CT/12:30 p.m. ET – 2:30 p.m. CT/3:30 pm ET.

Thanks, and talk soon,


R. Kent Piacenti
Law Office of R. Kent Piacenti, PLLC
8350 N. Central Expy, Suite 1900
Dallas, TX 75206
Tel:  214-888-3639
Fax: 214-396-2025
kent@piacentilaw.com

**From:** Dean Calloway <dcalloway@asburyauto.com>
**Sent:** Thursday, August 11, 2022 8:10 AM
**To:** R. Kent Piacenti <kent@piacentilaw.com>
**Subject:** RE: 2022-07-18 Letter from R. Kent Piacenti to Jed Milstein re: Michael Tupac

I am available on Friday afternoon from 100 pm to 300 pm.

**From:** R. Kent Piacenti [mailto:kent@piacentilaw.com]
**Sent:** Monday, August 8, 2022 3:44 PM
**To:** Dean Calloway <dcalloway@asburyauto.com>
**Subject:** RE: 2022-07-18 Letter from R. Kent Piacenti to Jed Milstein re: Michael Tupac

CAUTION: This email originated from outside of Asbury. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Sounds good. Tomorrow and Wednesday I'm pretty open. Thursday is not great. Friday is doable. Let me know what works for you. 10-4 on communications going to you. Thanks.

R. Kent Piacenti
Law Office of R. Kent Piacenti, PLLC
8350 N. Central Expy, Suite 1900
Dallas, TX 75206
Tel:  214-888-3639
Fax: 214-396-2025
kent@piacentilaw.com

**From:** Dean Calloway <dcalloway@asburyauto.com>
**Sent:** Friday, August 5, 2022 6:36 AM
**To:** R. Kent Piacenti <kent@piacentilaw.com>
**Subject:** RE: 2022-07-18 Letter from R. Kent Piacenti to Jed Milstein re: Michael Tupac

I will need to look at my calendar on Monday.

Please direct any further communications to me.

**From:** R. Kent Piacenti [mailto:kent@piacentilaw.com]
**Sent:** Thursday, August 4, 2022 8:10 PM
**To:** Dean Calloway <dcalloway@asburyauto.com>
**Subject:** FW: 2022-07-18 Letter from R. Kent Piacenti to Jed Milstein re: Michael Tupac

CAUTION: This email originated from outside of Asbury. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dean,

I think Jed intended to cc you on his reply to my email below. Is there a time early next week we can talk?

Thanks much,

R. Kent Piacenti
Law Office of R. Kent Piacenti, PLLC
8350 N. Central Expy, Suite 1900
Dallas, TX 75206
Tel:  214-888-3639
Fax: 214-396-2025
kent@piacentilaw.com

---

**From:** Jed Milstein <jmilstein@asburyauto.com>
**Sent:** Wednesday, August 3, 2022 9:59 AM
**To:** R. Kent Piacenti <kent@piacentilaw.com>
**Subject:** RE: 2022-07-18 Letter from R. Kent Piacenti to Jed Milstein re: Michael Tupac

Good morning Mr. Piacenti.

I have copied Dean Calloway, Associate General Counsel for Asbury Automotive Group.

Please direct all correspondence to Dean's attention.

Thank you.


Jed M. Milstein
Asbury Automotive Group
SVP and Chief Human Resources Officer
Office: 770.418.8337
Cell: 678.822.6913

---

**From:** R. Kent Piacenti <kent@piacentilaw.com>
**Sent:** Wednesday, August 3, 2022 12:18 AM
**To:** Jed Milstein <jmilstein@asburyauto.com>
**Cc:** R. Kent Piacenti <kent@piacentilaw.com>
**Subject:** RE: 2022-07-18 Letter from R. Kent Piacenti to Jed Milstein re: Michael Tupac

CAUTION: This email originated from outside of Asbury. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Just following up. Is there a time this week or early next week that you and I could talk by phone? I'm hoping to learn where things stand with any investigation and particularly with respect to Michael's request for a transfer. There have been a few events over the last two weeks that heighten our retaliation concerns, and a transfer would seem to alleviate many of those concerns.

I also want to bring some potential accounting/compliance issues to your attention that Michael raised at the store level.

If there are a couple times you're available for a call, I should be able to work around your schedule and make one of them work.

All best,

R. Kent Piacenti
Law Office of R. Kent Piacenti, PLLC
8350 N. Central Expy, Suite 1900
Dallas, TX 75206
Tel:  214-888-3639
Fax: 214-396-2025
kent@piacentilaw.com

---

**From:** R. Kent Piacenti
**Sent:** Monday, July 18, 2022 10:06 AM
**To:** jmilstein@asburyauto.com
**Cc:** R. Kent Piacenti <kent@piacentilaw.com>
**Subject:** 2022-07-18 Letter from R. Kent Piacenti to Jed Milstein re: Michael Tupac

Jed,

Please see the attached correspondence sent on behalf of my client, Michael Tupac.

Best,

R. Kent Piacenti
Law Office of R. Kent Piacenti, PLLC
8350 N. Central Expy, Suite 1900
Dallas, TX 75206
Tel:  214-888-3639
Fax: 214-396-2025
kent@piacentilaw.com

# **Exhibit 4**
TCR Report

Submission Number 16631-070-509-259 was submitted on Tuesday, September 13, 2022 at 07:11:46 PM EDT

This PDF was generated on Tuesday, September 13, 2022 at 07:12:20 PM EDT

Thank you for contacting the United States Securities and Exchange Commission.  This automated response confirms that your submission has been received successfully.  We are always interested in hearing from the public, and your submission will be given careful consideration in view of the Commission's overall responsibilities under the federal securities laws.  Please note, however, that it is the Commission's policy to conduct its investigations on a non-public basis in order to preserve the integrity of its investigative process.  Subject to the provisions of the Freedom of Information Act, we cannot disclose to you any information which we may gather, nor can we confirm the existence or non-existence of an investigation, unless such information is made a matter of public record in proceedings brought before the Commission or the courts.  Therefore, this may be the only response that you receive.  If you want to learn more about how the Commission handles inquiries or complaints, please visit http://www.sec.gov/complaint/info_tipscomplaint.shtml.

## What is your complaint about?

Q: Please select the option that best describes your complaint.

A:  Material misstatement or omission in a company's public filings or financial statements, or a failure to file

Q: Please select the specific category that best describes your complaint.

A:  False/misleading press release

Q: Is this supplemental information to a previous complaint?

A:  No

Q: In your own words, describe the conduct or situation you are complaining about.

A:  Asbury Automotive Group has set an annual revenue target of $32 billion for 2025 up from about $15.3 billion in 2022. It cites Clicklane, its supposedly "100% online" digital sales channel, as a key driver of this growth, predicting $8 billion, or 25%, of the anticipated $32 billion will come from Clicklane. But its numerous statements in SEC filings and press releases about Clicklane, and related financial reports/statements, are simply false. For example: -Asbury says Clicklane is 100% online, but it's not. In states that require wet signatures on documents, such as Texas, Asbury voids the online signatures and the customer signs all new paperwork by hand upon delivery of the

documents. -Asbury says the average cash purchase takes 8 minutes and financed purchase takes 14 minutes on Clicklane, but both take far longer. -Asbury says 92% of Clicklane deals are "incremental"--i.e. customers Asbury would not otherwise have had, but the percentage is grossly inflated. The purpose of these misstatements is to give the false impression that Asbury has a competitive digital advantage that it does not have, and the effect is an inflated share price. Moreover, there is a concerted effort to improperly inflate the volume of Clicklane deals by misclassifying deals from other channels as though they had happened online. This is occurring in at least the Park Place branded dealerships, of which there are eight, and which constitute nearly 10% of the dealerships currently using Clicklane. Included with this submission is a process document from one of the Park Place stores (Arlington), describing the three types of transactions that can be classified as Clicklane deals, two of which expressly funnel in-person customers into Clicklane deals. The process for re/mis-classifying deals as Clicklane deals works like this: -First, an entry is made in the customer-relationship-management ("CRM") software for a potential customer from a sales channel other than Clicklane (such as a walk-in). -Second, a sales persons guides a customer through, or directs a customer to, the Clicklane process for purchasing a car through the web, which creates a second CRM entry. -Third, once a car is selected, a manager merges the non-Clicklane entry into the Clicklane entry, so that only one CRM entry remains--a Clicklane entry. -Fourth, and finally, a manager changes the "sales person" in the system to "Clicklane," which results in the deal being booked for accounting purposes as a Clicklane deal, even though the sales lead came from a different source. This misclassifications of deals is encouraged by a compensation system that rewards General Managers and director-level employees based on Clicklane performance metrics, all of whom stress the importance of Clicklane deals to salespeople who are keenly aware of Asbury's intense focus on Clicklane as its supposedly 100% online sales channel. Management uses the inflated Clicklane numbers in earnings releases, earnings calls, and investor presentations to show that Asbury's direct online purchase tool is far more successful than it is, generating a large and growing share of sales that significantly outpaces reality. In particular, see slides 15-18 of the July 2022 Investor Relations Presentation, which is included in this submission. The intent is to represent Asbury as more competitive with direct online models such as Carvana and Vroom than it really is. The materially misleading statements or omissions referenced above and ones like them can be found in Asbury's earnings press releases for Q1 and Q2 2022, dated April 28, 2022, and July 28, 2022, respectively; Asbury's 10-Ks for the fiscal years ending December 31, 2020 and December 31, 2021; and the July 2022 Investor Relations Presentation--all of which are included with this submission.


Q: Are you having or have you had difficulty getting access to your funds or securities?

A: No


Q: Did you suffer a loss?

A: No


Q: When did you become aware of the conduct? (mm/dd/yyyy)

A: 01/21/2022


Q: When did the conduct begin? (mm/dd/yyyy)

A:  01/21/2022

Q: Is the conduct ongoing?
A:  Yes

Q: Has the individual or firm acknowledged the conduct?
A:  Unknown

Q: How did you learn about the conduct? You may select more than one answer.
A:  Account statements; Conversations; Internal business documents; Publicly available information; SEC filings

Q: Have you taken any action regarding your complaint? You may select more than one answer.
A:  Complained to firm; Other

Q: Provide details.
A:  Retained an attorney and sought advice.

## Who are you complaining about?

Subject # 1

Q: Are you complaining about a person or a firm?
A:  Firm

Q: Select the title that best describes the person or firm that you are complaining about.
A:  Publicly held company

Q: Are you or were you associated with the person or firm when the alleged conduct occurred?
A:  Yes

Q: How are you or were you associated with the person or firm you are complaining about?
A: Worked as a New Car Sales Manager for a car dealership owned by the company.


Q: Identifier Type
A: Ticker Symbol


Q: Ticker Symbol
A: ABG


Q: Are you a current or former Employee, Officer, Partner, or Employee Director of any entity you are complaining about?
A: Yes


Q: Check all that apply.
A: Employee


Q: Are you a current or former Non-Employee Director, Consultant, Contractor or Trustee of any entity you are complaining about?
A: No


Q: Firm Name
A: ASBURY AUTOMOTIVE GROUP INC


Q: Street Address
A: 2905 Premiere Parkway


Q: Address (Continued)
A: Suite 300

Q: Zip / Postal Code
A: 30097


Q: City
A: DULUTH


Q: State / Province
A: GA


Q: Country
A: US


Q: Work Phone
A: (770) 418-8200


Q: Email Address
A: info@asburyauto.com


Q: Website
A: https://www.asburyauto.com/


## Which investment products are involved?


Q: Select the type of product involved in your complaint.
A: Equities (e.g., common stock, preferred stock)


Q: Please select the category that best describes the security product.

A:  Common stock (exchange-traded stock)


Q: Enter the ticker symbol, if known.
A:  ABG


Q: Enter the product name(s)
A:  all securities of ABG are affected


## About you

Submitter # 1


Q: Are you filing this tip under the SEC's whistleblower program?
A:  Yes


Q: Are you an attorney filling out this form on behalf of an anonymous whistleblower client who is seeking an award?
A:  No


Q: Title
A:  Mr


Q: First Name
A:  Michael


Q: Middle Name
A:  David


Q: Last Name
A:  Tupac

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

Q: Country
A: USA


Q: Mobile Telephone
A: 214-205-2725


Q: Email Address
A: mtupac@msn.com


Q: What is the best way to reach you?
A: Phone


Q: Are you represented by an attorney in connection with this matter, or would you like to provide your attorney's contact information?
A: Yes


Q: Attorney Title
A: Mr


Q: Attorney First Name
A: R. Kent


Q: Attorney Last Name
A: Piacenti


Q: Attorney Firm Name
A: Law Office of R. Kent Piacenti, PLLC

Q: Attorney Street Address
A: 8350 N. Central Expy


Q: Attorney Address (Continued)
A: Suite 1900


Q: Attorney Zip / Postal Code
A: 75206


Q: Attorney City
A: DALLAS


Q: Attorney State / Province
A: TX


Q: Attorney Country
A: USA


Q: Attorney Work Telephone
A: 2148883639


Q: Attorney Fax Telephone
A: 214-396-2025


Q: Attorney Email Address
A: kent@piacentilaw.com

Q: Select the profession that best represents you.

A: Other


Q: For Other, please specify.

A: Sales Professional


Q: Have you reported the matter at issue in this submission to your supervisor, compliance office, whistleblower hotline, ombudsman, or any other available mechanism for reporting possible violations at any entity you are complaining about?

A: Yes


Q: If you answered "Yes," please provide details.

A: I directed my attorney to have a phone conversation with company counsel about "accounting and compliance concerns," but company counsel would either end a phone conversation with him prematurely or otherwise ignore or delay his requests for a call. My attorney reported the matter on my behalf in writing by email dated September 8, 2022.


Q: Were you retaliated against for reporting the matter at issue in this submission either internally at the entity or to a regulator?

A: No


Q: Has anyone taken steps to prevent you from reporting this violation to the SEC?

A: Yes


Q: If you answered "Yes," please provide details.

A: I am subject to an arbitration agreement that expressly governs disputes relating to whistleblowing activity but does not contain a carveout permitting employees to directly contact the SEC. The agreement is dated October 1, 2010 and was still being provided to new employees at least as late as late 2020.


Q: Are documents or other information being submitted that could potentially identify the whistleblower?

A: Yes

Q: Identify with particularity any documents or other information in your submission that you believe could reasonably be expected to reveal your identity.

A:  The following could identify me: (1) the document titled Clicklane Management Process, with the letterhead of Park Place Arlington and approval date January 21, 2022; and (2) my attorney's identification of the issues raised in this report to company counsel, Dean Calloway.


Q: Does the whistleblower want to be eligible to apply for a whistleblower award?

A:  Yes


Q: 1. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer or employee of the Department of Justice; the Securities and Exchange Commission; the Comptroller of the Currency; the Board of Governors of the Federal Reserve System; the Federal Deposit Insurance Corporation; the Office of Thrift Supervision; the Public Company Accounting Oversight Board; any law enforcement organization; or any national securities exchange, registered securities association, registered clearing agency, or the Municipal Securities Rulemaking Board?

A:  No


Q: 2. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer, or employee of a foreign government, any political subdivision, department, agency, or instrumentality of a foreign government, or any other foreign financial regulatory authority as that term is defined in Section 3(a)(52) of the Securities Exchange Act of 1934 (15 U.S.C. Section 78c(a)(52))?

A:  No


Q: 3. Did you acquire the information being submitted to us through the performance of an engagement required under the federal securities laws by an independent public accountant?

A:  No


Q: 4. Are you providing this information pursuant to a cooperation agreement with the SEC or another agency or organization?

A:  No


Q: 5. Are you a spouse, parent, child, or sibling of a member or employee of the SEC, or do you reside in the same household as a member or employee of the SEC?

A:  No

Q: 6. Have you or anyone representing you received any request, inquiry or demand that relates to the subject matter of your submission (i) from the SEC; (ii) in connection with an investigation, inspection or examination by the Public Company Accounting Oversight Board, or any self-regulatory organization; or (iii) in connection with an investigation by Congress, any other authority of the federal government, or a state Attorney General or securities regulatory authority?

A:  No

Q: 7. Are you currently a subject or target of a criminal investigation, or have you been convicted of a criminal violation, in connection with the information you are submitting to the SEC?

A:  No

Q: 8. Did you acquire the information being provided to us from any person described in Questions 1 through 7?

A:  No

Q: I declare under penalty of perjury under the laws of the United States that the information contained herein is true, correct and complete to the best of my knowledge, information, and belief. I fully understand that I may be subject to prosecution and ineligible for a whistleblower award if, in my submission of information, my other dealings with the SEC, or my dealings with another authority in connection with a related action, I knowingly and willfully make any false, fictitious, or fraudulent statements or representations, or use any false writing or document knowing that the writing or document contains any false, fictitious, or fraudulent statement or entry.

A:  Agree

Documents

| Document Name | Document Type |
|---|---|
| 2022-04-28 Q1 Earning Announcement.pdf | application/pdf |
| 2022-07-28 Q2 Earnings Announcement.pdf | application/pdf |
| Asbury 10-K FY 2020.pdf | application/pdf |
| Asbury 10-K for FY 2021.pdf | application/pdf |
| 2Q22_IR_Presentation-FINAL.pdf | application/pdf |
| Clicklane Management Process.docx | application/vnd.openxmlformats-officedocument.wordprocessingml.document |

# **<u>Exhibit 5</u>**

Emails bn K. Piacenti & C. Phillips (SEC) (Nov. 28, 2023)

Received: Nov 28, 2022 7:27 AM
Expires: Feb 26, 2023 7:27 AM
From: phillipsc@sec.gov
To: kent@piacentilaw.com
Cc:
Subject: RE: RE: US Securities & Exchange Commission smail

ok

From: kent@piacentilaw.com <kent@piacentilaw.com>
Sent: Sunday, November 27, 2022 7:00 PM
To: Phillips, Craig S. <PhillipsC@SEC.GOV>
Subject: FW: RE: US Securities & Exchange Commission smail

CAUTION: This email originated from outside of the organization. Do not click links
or open attachments unless you recognize the sender and know the content is safe.

This message was sent securely using
Zix®<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-7
34204b77a74d53e&q=1&e=fe67c5cd-6d5a-40a8-a096-285e5b2502c5&u=http%3A%2F%2Fwww.zixcor
p.com%2Fget-started%2F>


To follow up, after completing its investigation, Asbury terminated Mr. Tupac on
November 14, 2022. The local GM, Malcolm Gage, cited only unspecified "misconduct"
as the reason. Jordan Hunter of HR escorted him out but without following standard
procedures, such as explaining his COBRA rights. His final check did not include
commissions due and certain other amounts.

--- Originally sent by kent@piacentilaw.com<mailto:kent@piacentilaw.com> on Oct 21,
2022 3:19 PM ---
Below is a revised version of my email from last night. It contains only a handful
of non-substantive corrections.

***
I'm writing with an update and to inform you of Asbury's violation of 17 C.F.R. §
240.21F-17, which prohibits anyone from impeding an individual from communicating
with the SEC about possible violations of the securities laws. I've attached the
relevant correspondence.

To make a long story short:

  *   After my client, Michael Tupac, reported harassment, his superiors began
writing him up on questionable grounds.
  *   On July 18, I wrote to Jed Milstein, objecting to the retaliation and raising
concerns about the mishandling of Tupac's rights under the FMLA.  Asbury said it
would investigate, but it did not.
  *   Tupac initially decided that I should raise the securities concerns over the
phone, but after a month of trying, we finally raised them in an email sent
September 9.

    *   Just a week later, on September 16, Bob Chadwick told me he represents Asbury
and accused Tupac of mishandling confidential information.
    *   On October 3, 2022, Tupac was written up for "harassing" co-workers. The
accusation is baseless.
    *   That same day, Chadwick sent the attached letter announcing that another
outside attorney, Sandy Lauro, would investigate Tupac's allegations (effectively
confirming Asbury had not previously investigated). But there would be three
additional topics: Tupac's alleged mishandling of confidential information,
insubordination, and harassment of co-workers.
    *   On October 7, 2022, given Asbury's aggressive moves, we informed the Company
that we had reported to, and were cooperating with, the SEC. We also alerted them to
§ 240.21F-17.
    *   Since then, we have cooperated with the Company's investigation. Tupac sat for
an interview on October 12, and we provided additional information to Lauro on
September 19. Lauro has said she will reach out next week with any additional
follow-up questions or requests.

We believe that at least Chadwick's September 16 email, his October 3 letter, the
October 3 write-up, and any portion of the investigation that extends past the
matters Tupac brought to the Company's attention violates § 240.21F-17. Given only
the SEC can enforce this rule, we are providing this information so that the SEC can
use it as it deems appropriate.

Please let me know if any additional information would be helpful.

Best regards,

Kent
--- Originally sent by phillipsc@sec.gov<mailto:phillipsc@sec.gov> on Oct 10, 2022
1:00 PM ---
This message was sent securely using Zix ®
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-73420
4b77a74d53e&q=1&e=fe67c5cd-6d5a-40a8-a096-285e5b2502c5&u=http%3A%2F%2Fwww.zixcorp.co
m%2Fget-started%2F>


I will look at this and let you know if need anything else

From: kent@piacentilaw.com<mailto:kent@piacentilaw.com>
<kent@piacentilaw.com<mailto:kent@piacentilaw.com>>
Sent: Friday, October 07, 2022 1:13 PM
To: Phillips, Craig S. <PhillipsC@SEC.GOV<mailto:PhillipsC@SEC.GOV>>
Subject: RE: US Securities & Exchange Commission smail

CAUTION: This email originated from outside of the organization. Do not click links
or open attachments unless you recognize the sender and know the content is safe.

This message was sent securely using Zix ®
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-73420
4b77a74d53e&q=1&e=d523e5b2-65a6-424d-9218-67a53ad52737&u=http%3A%2F%2Fwww.zixcorp.co

m%2Fget-started%2F>

Below are Mr. Tupac's answers to the SEC's recent questions. Please note that Mr. Tupac has provided additional information at the end of this submission about the retaliation he is currently experiencing at work.

(1) About what percent of the dealerships operate in states that require a physical signature on the paperwork?

Mr. Tupac doesn't know but notes that page 8 of Asbury's 2021 10-K shows how many dealerships Asbury has in each of the 15 states in which it operates. The answer to the question could be calculated after a determination of which of the 15 states require physical signatures.

(A) Would Carvana and Vroom customers also be required to provide physical signatures in the applicable states such as Texas?

Yes

(2) Do you have any information that customers are discouraged from using Clicklane or making future Clicklane purchases because of the physical signature requirement?

Yes. On September 24, 2022, a true Clicklane customer—a customer originated online who completed the entire Clicklane process online—arrived at the store expecting to take delivery of a vehicle he purchased through Clicklane. The employees struggled to complete the transaction. They didn't know what to do because there are so few true Clicklane deals. Eventually, when they had him sign the physical paperwork, the customer expressed some frustration about the duplicative paperwork. Unsurprisingly, having come so far, he did not abandon the transaction, but the duplicative paperwork probably will make him less likely to use Clicklane for future purchases. It is a near certainty that similar scenarios are occurring at the numerous Asbury dealerships using Clicklane.

(3) About how long does the average cash purchase and finance purchase take respectively?

Mr. Tupac doesn't know, but please see the answer to Question 4 below.
1.  Do you have any information about the time it takes on Carvana or Vroom for these types of transactions?

Page 2 of Carvana's 2021 10-K reports: "Our transaction technologies and online platform transform a traditionally time consuming process by allowing customers to secure financing, complete a purchase or sale, and schedule delivery or pick-up online in as little as 10 minutes.

(4) Briefly, how do you know that it is not 8 minutes for cash transactions and 14 minutes for finance transactions on average?

Mr. Tupac currently has access to a rolling 30-day lookback into Clicklane transactions, including timestamps that mark the beginning and end of the purchase process. On September 17, 2022, he ran a report of all true Clicklane deals across all of Park Place between August 18 and September 17, 2022. There were only 13 true Clicklane deals, only one of which (9 minutes) was completed in about the average times that Asbury reports. The rest ranged from 18 minutes to nearly 3.5 hours. Not a single transaction took as few as 8 minutes, and nearly 40% took over an hour. The discrepancy between these transaction times and the reported Company-wide averages are so large that they render the Company's numbers implausible.

(5) Do you have any information that customers are discouraged from using Clicklane or making future Clicklane purchases because of the time required to perform the transactions?

Please see the answer to Question 2. Signing the physical paperwork—assuming all goes smoothly—adds at least 30 minutes to a transaction that supposedly can be done 100% online. Presumably the additional time was part of the customer's frustration with having to sign the physical paperwork.  Additionally, differences between Park Place's and Asbury's financial systems made payment difficult and consumed a significant amount of time. After initially paying $5,000 by credit card, consistent with typical in-store Park Place transactions, the bank Clicklane approved, and through which the client financed the vehicle, would not accept the credit card payment due to its loan criteria. To take delivery of the car, the client had to pay $5,000 in cash and then wait at least two days for his credit card to be refunded

(6) You stated that sales occurring from other methods are being classified as Clicklane.  Using the information from Q2 earnings release (see link below), what are the true statistics.  For instance, the company reported … But, true number is about ….

Document (sec.gov)
<https://www.sec.gov/Archives/edgar/data/1144980/000114498022000139/a2022q2ex991.htm >

Extrapolating from the limited information he has, Mr. Tupac's best estimates are:
•    The Company reported almost 6,600 vehicles soldon Clicklane, but the number of true Clicklanedeals is likely between 400 and 450.
•    The Company reported 92% of Clicklane transactions were customers incremental to Asbury Automotive, but the real number may be around 50%.
o About 40-50% of Park Place deals are for returning customers, but Asbury's report of incremental sales means only 8% of Clicklane transactions were for returning customers. Because the vast majority of "Clicklane" deals came from Park Place's general customer base, the percentage of transactions attributable to returning customers must be far greater than 8% with a corresponding reduction to the supposedly 92% of deals that are incremental.
o 95% of deliveries occurred within a 50-Mile radius of an Asbury dealership is another reason to suspect a higher percentage of returning customers.
o Park Place has 3 of the 6 Mercedes-Benz dealerships, 2 of the 4 Lexus dealerships, 1 of 4 Volvo and Jaguar Land Rover dealerships and 1 of 3 Porsche dealerships in the Dallas/Fort Worth area. Thus, there's a good chance that DFW drivers of those brands

who purchase through Clicklane are returning Park Place Customers.
• 92% might be the correct number if the Company is including customers who are returning customers to the dealerships but who are new customers to Asbury. In that case, the statement, though literally true, is still false and misleading, because it gives the impression that Clicklane will generate far more revenue than is reasonable to expect. Omitting the fact that a percentage of the new-to-Asbury Clicklane customers had previously purchased a vehicle from a dealership Asbury acquired is materially misleading.

(7) With respect to your allegations, you wrote "This is occurring in at least the Park Place branded dealerships, of which there are eight, and which constitute nearly 10% of the dealerships currently using Clicklane." To what extent do you have information that these various wrongdoings are occurring at the other dealerships ( i.e., non- Park Place) that are using Clicklane.

Mr. Tupac does not have specific information from other dealership brands, but the large discrepancy between Park Place transactions reported as Clicklane deals vs those that are true Clicklane deals almost certainly means other dealership brands cannot be achieving the reported Clicklane numbers from online sales alone.

(8) You wrote that "Asbury Automotive Group has set an annual revenue target of $32 billion for 2025 up from about $15.3 billion in 2022." Do you have any information to indicate that the $32 billion estimate was made without a reasonable basis?

            Yes.

(A) If so, please briefly explain why the $32 billion is not reasonable and what might be a more reasonable estimate?

The $32 billion estimate was made without a reasonable basis because 25% of it—$8 billion—is attributable to Clicklane. Even using the Company's manipulated numbers, Clicklane is estimated to generate only $1 billion in 2022 with 88 dealerships using it. See Investor Presentation at (July 2022). They attribute the projected $7 billion increase in revenue to more inventory and more dealerships using Clicklane, but the projection seems incredibly rosy at best. When you consider that most of the supposed Clicklane deals that make up the $1 billion are not true Clicklane deals, the $8 billion projection seems completely unreasonable and renders the $32 billion Company-wide estimate unreasonable, too.

(9) With respect to the Arbitration agreement, you stated that it "does not contain a carveout permitting employees to directly contact the SEC."
1.  Please send me the agreement.

Attached

(B) As a result of the lack of a carveout, do you believe that the agreement prevents you from reporting the allegations to the SEC?

We believe it attempts to, but do not believe it can legally preclude Mr. Tupac's report.

(1) If so, what passage do you find most troubling?

Paragraph 2 and 2(B) in particular are the most troubling. Under the Agreement, all "Disputes" are subject to arbitration, and "Disputes" expressly includes "whistleblowing activity." Paragraph 2(C) contains carveouts for charges with the NLRB and the EEOC and similar agencies. Notably, it does not carveout all government agencies, nor does it carve out the SEC specifically. Note that the arbitration agreement is dated just months after the passage of the Dodd-Frank Act.

*         *         *

Mr. Tupac would also like to report additional attempts to retaliate, harass, silence, or otherwise prevent him from reporting to the SEC

On September 16, 2022, we learned the Company retained outside counsel and is accusing Mr. Tupac of removing confidential information from the Company. I have attached the email from their counsel, Robert Chadwick. I note that the confidentiality provisions in the attached handbook also do not contain a carveout for communicating with the SEC. See Handbook at 22-23. (I have attached the 2021 Handbook and have requested from Mr. Chadwick the 2022 Handbook.).

A formal letter followed on October 3, 2022, disclosing that the Company hired additional outside counsel, Sandy Lauro, to investigate. Ms. Lauro has said her role is as a neutral fact-finder, but there is reason to question the Company's methods and intent.

Mr. Chadwick's letter establishes the scope of the investigation, identifying four issues:
1.     Mr. Tupac's allegations of "unlawful or inappropriate conduct" at the dealership;
2.     Mr. Tupac's removal of confidential documents from the dealership in violation of company policy;
3.     Workplace conduct problems dating back to late 2020; and
4.     Complaints by Mr. Tupac's co-workers of unwelcome harassment and interference with their job duties.

Letter from R. Chadwick to K. Piacenti (Oct. 3, 2022) at 1 (attached). In other words, the Company has made Mr. Tupac the primary focus of the investigation.

The issues practically state the Company's conclusions, all of which are misleading. The only confidential information Mr. Tupac supposedly "removed" from the Company was a Clicklane document provided to the SEC with his good-faith report. There were no workplace conduct problems dating back to late 2020; he received no discipline until 2022—and then it was in retaliation for reporting harassment. Mr. Tupac has not said or done anything that could be reasonably construed as harassment. Also on October 3, 2022, the Company wrote up Mr. Tupac for having conversations with employees regarding "information being accumulated by you for a potential lawsuit against the Company"—labeling the conversations "harassment" and "interference—and it prohibited him from further "harassment" and "interference"—

i.e., from getting information about the Company's wrongdoing. The attached write-up states there will be an investigation of the issues but nevertheless imposes discipline without awaiting the results of the investigation.


--- Originally sent by phillipsc@sec.gov<mailto:phillipsc@sec.gov> on Oct 3, 2022 12:13 PM ---
This message was sent securely using Zix ®
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-73420 4b77a74d53e&q=1&e=d523e5b2-65a6-424d-9218-67a53ad52737&u=http%3A%2F%2Fwww.zixcorp.co m%2Fget-started%2F>


Within the next few days is fine

From: kent@piacentilaw.com<mailto:kent@piacentilaw.com>
<kent@piacentilaw.com<mailto:kent@piacentilaw.com>>
Sent: Monday, October 03, 2022 10:58 AM
To: Phillips, Craig S. <PhillipsC@SEC.GOV<mailto:PhillipsC@SEC.GOV>>
Subject: RE: US Securities & Exchange Commission smail

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

This message was sent securely using Zix ®
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-73420 4b77a74d53e&q=1&e=5f54c0f0-9ab2-4f0c-b3e8-f9d9a6c83d33&u=http%3A%2F%2Fwww.zixcorp.co m%2Fget-started%2F>


Thanks for your patience and for checking in. My client moved into a new house last week, and I am on vacation. We are nearly finished, however. Considering you'll be out most of today, I will submit the response no later than tomorrow.

--- Originally sent by phillipsc@sec.gov<mailto:phillipsc@sec.gov> on Oct 3, 2022 7:49 AM ---
This message was sent securely using Zix ®
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-73420 4b77a74d53e&q=1&e=5f54c0f0-9ab2-4f0c-b3e8-f9d9a6c83d33&u=http%3A%2F%2Fwww.zixcorp.co m%2Fget-started%2F>


What is your timeframe for responding?

FYI- I will be out of the office most of the day


From: Phillips, Craig S.
Sent: Monday, September 19, 2022 9:34 AM
To: 'kent@piacentilaw.com' <kent@piacentilaw.com<mailto:kent@piacentilaw.com>>

Subject: RE: US Securities & Exchange Commission smail

Take your time.  If he does not know an answer- just state so.  Please respond all
at once.  At that time, feel free to up any information (e.g., related to
retaliation).

I will look at this when you respond to the other questions.

I cannot offer any legal advice.  That being said, as you likely know retaliation is
illegal under Dodd Frank.  The SEC Whistleblower office has information about that

SEC.gov | Office of the Whistleblower<https://www.sec.gov/whistleblower>

From: kent@piacentilaw.com<mailto:kent@piacentilaw.com>
<kent@piacentilaw.com<mailto:kent@piacentilaw.com>>
Sent: Friday, September 16, 2022 8:00 PM
To: Phillips, Craig S. <PhillipsC@SEC.GOV<mailto:PhillipsC@SEC.GOV>>
Subject: RE: US Securities & Exchange Commission smail

CAUTION: This email originated from outside of the organization. Do not click links
or open attachments unless you recognize the sender and know the content is safe.

This message was sent securely using Zix ®
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-73420
4b77a74d53e&q=1&e=a8edea2d-33e2-4881-8cce-033a4868810e&u=http%3A%2F%2Fwww.zixcorp.co
m%2Fget-started%2F>


I'll need some time to consult with my client on these questions, and he may need
some time to determine some of the answers. I suspect he will not have access to all
the information necessary to answer all of them.

I mentioned on the TCR form the attached Arbitration Agreement, which I believe
attempts to impede reporting to the SEC. I would point you to paragraph 2 and 2(B)
in particular. Under the Agreement, all "Disputes" are subject to arbitration, and
"Disputes" expressly includes "whistleblowing activity." Paragraph 2(C) contains
carveouts for charges with the NLRB and the EEOC and similar agencies. Notably, it
does not carveout all government agencies, nor does it carve out the SEC
specifically. We do not believe such agreement can validly preclude Mr. Tupac's
report and further assistance, though it appears intended to. Note that the
arbitration agreement is dated just months after the passage of the Dodd-Frank Act,
which directed creation of the SEC's whistleblower program.

As of this morning, Asbury appears to be trying a new tactic to silence Mr. Tupac.
The Company retained outside counsel and has accused Michael of removing
confidential information and providing it to unauthorized persons. I have attached
the email from their counsel, Robert Chadwick. I am awaiting the "more formal
position" referred to in his email. I suspect they intend to terminate or at least
discipline him. I note that the confidentiality provisions in the attached handbook
quoted in Mr. Chadwick's email also do not contain a carveout for communicating with

the SEC. See Handbook at 22-23.

The timing is particularly suspicious and appears prompted by our internal report of
the securities issues. I had been in communication with one of their in-house
attorneys, Dean Calloway, since July regarding concerns about FMLA rights and
retaliation Michael experienced after reporting Title VII violations to the Company.
There was no mention made of Michael improperly providing confidential information
then or in the nearly two months since, despite my communications with Mr. Calloway
about Company policy and the relevant events. Now just over a week after we first
alerted them to concerns about securities violations related to Clicklane and just
two days after I provided them the document showing an official policy at Park Place
Arlington of steering non-online customers to Clicklane, they've hired outside
counsel and are raising confidentiality concerns.

To the extent you are able to advise or at least point me to resources that would
help preserve our ability to assist you in the investigation while preventing the
Company from taking action against him, it would be much appreciated.

Thanks,

Kent

--- Originally sent by phillipsc@sec.gov<mailto:phillipsc@sec.gov> on Sep 16, 2022
8:15 AM ---
This message was sent securely using Zix ®
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-73420
4b77a74d53e&q=1&e=a8edea2d-33e2-4881-8cce-033a4868810e&u=http%3A%2F%2Fwww.zixcorp.co
m%2Fget-started%2F>


Please let us use this email string to send questions/responses back and forth.  At
the end of the process, I would like to have one complete email string which
captures everything.

A few questions:

(1) About what percent of the dealerships operate in states that require a physical
signature on the paperwork?


(A) Would Carvana and Vroom customers also be required to provide physical
signatures in the applicable states such as Texas?


(2) Do you have any information that customers are discouraged from using Clicklane
or making future Clicklane purchases because of the physical signature requirement?


(3) About how long does the average cash purchase and finance purchase take
respectively?

(A) Do you have any information about the time it takes on Carvana or Vroom for these types of transactions?

(4) Briefly, how do you know that it is not 8 minutes for cash transactions and 14 minutes for finance transactions on average?

(5) Do you have any information that customers are discouraged from using Clicklane or making future Clicklane purchases because of the time required to perform the transactions?

(6) You stated that sales occurring from other methods are being classified as Clicklane.  Using the information from Q2 earnings release (see link below), what are the true statistics.  For instance, the company reported … But, true number is about ….

Document (sec.gov)<https://www.sec.gov/Archives/edgar/data/1144980/000114498022000139/a2022q2ex991.htm>

(7) With respect to your allegations, you wrote "This is occurring in at least the Park Place branded dealerships, of which there are eight, and which constitute nearly 10% of the dealerships currently using Clicklane." To what extent do you have information that these various wrongdoings are occurring at the other dealerships (i.e., non- Park Place) that are using Clicklane.

(8) You wrote that "Asbury Automotive Group has set an annual revenue target of $32 billion for 2025 up from about $15.3 billion in 2022."  Do you have any information to indicate that the $32 billion estimate was made without a reasonable basis?

(A) If so, please briefly explain why the $32 billion is not reasonable and what might be a more reasonable estimate?

(9) With respect to the Arbitration agreement, you stated that it "does not contain a carveout permitting employees to directly contact the SEC."

(A) Please send me the agreement.

(B) As a result of the lack of a carveout, do you believe that the agreement prevents you from reporting the allegations to the SEC?

(1) If so, what passage do you find most troubling?


Note that the information you provide is entirely voluntary, and you do not have to answer any question if you do not wish to do so.  There are no penalties or sanctions for not providing information to the SEC staff.  If you are comfortable answering the questions, and have already read the Form 1662 I previously provided, please answer the questions below to the best of your ability.  If you do not know the answer to the question, please just write that you do not know.


From: kent@piacentilaw.com<mailto:kent@piacentilaw.com>
<kent@piacentilaw.com<mailto:kent@piacentilaw.com>>
Sent: Thursday, September 15, 2022 2:55 PM
To: Phillips, Craig S. <PhillipsC@SEC.GOV<mailto:PhillipsC@SEC.GOV>>
Subject: RE: US Securities & Exchange Commission smail

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

This message was sent securely using Zix ®
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-73420
4b77a74d53e&q=1&e=c282c366-779c-4db5-b2f0-3ee29aa3059e&u=http%3A%2F%2Fwww.zixcorp.co
m%2Fget-started%2F>


Mr. Phillips,

Nice to speak to you yesterday. Please find the answers to each of your questions in red below. If any additional information would be helpful, just let me know.

All best,

Kent

--- Originally sent by phillipsc@sec.gov<mailto:phillipsc@sec.gov> on Sep 14, 2022 11:46 AM ---
This message was sent securely using Zix ®
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-73420
4b77a74d53e&q=1&e=c282c366-779c-4db5-b2f0-3ee29aa3059e&u=http%3A%2F%2Fwww.zixcorp.co
m%2Fget-started%2F>


Dear Mr. Piacenti

Per our telephone conversation, my name is Craig Phillips, an accountant at the United States Securities and Exchange Commission, Division of Enforcement, Office of Market Intelligence.  I have received your complaint dated September 13, 2022 concerning Asbury Automotive Group and am gathering additional information for my

review.

I understand that your client (Michael Tupac) may have some information that may be helpful to SEC Staff regarding possible wrongdoing at Asbury Automotive Group.

Before I am able to speak to you/ your client, I would like to obtain (and verify) some information about your client:

(1)      Has your client ever been employed by Asbury Automotive Group?  If not, skip to question No. (2)
  Yes
·       Is your client still employed at Asbury Automotive Group?  If so, what is your client's current position there?
 Yes, Mr. Tupac's title is New Car Sales Manager at Park Place Arlington--one of eight Park Place dealerships, all of which are owned by Asbury Automotive Group.
·       If your client is not currently employed at Asbury Automotive Group, what was your client's last position there?
  N/A
·       Did your client deal with Asbury Automotive Group's lawyers on a routine basis on their job?  If not, tell me the number of times that your client dealt with Asbury Automotive Group's lawyers and describe in general what those dealings were.
No, Mr. Tupac's dealings with Asbury's lawyers were limited to a few email exchanges about a year ago with Dean Calloway, Associate General Counsel, regarding a client who bounced a check.
·       Was your client an officer or director , or have a senior officer position at Asbury Automotive Group?  In other words, did your client have the authority to bind Asbury Automotive Group in any way (i.e. such as settling matters on behalf of Asbury Automotive Group, or enter the company into contracts)?
 No (to both questions).
·       Was your client authorized to speak for the company as a spokesperson or otherwise?
  No
·       Has Asbury Automotive Group stated that their legal counsel is representing your client?
  No

(2)      What country are you and your client currently standing in?
  USA

I am also enclosing our standard Form 1662 which discusses, among other matters, the routines uses of information provided to the SEC.  Please read this important form before replying to me.  The Form 1662 is a standard form which we provide to all persons who may have information that they may want to provide to the SEC.  Your/your client's cooperation is voluntary.

Kind regards,

Craig Phillips
SEC: Division of Enforcement, Office of Market Intelligence
100 F St, NE

```
Washington, DC 20549-5841
202-551-4559 (office)
202-802-8408 (cell)



----------------------------------------------------------------------
This message was secured by Zix Corp
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-a14b8
12d34193c67&q=1&e=c282c366-779c-4db5-b2f0-3ee29aa3059e&u=http%3A%2F%2Fwww.zixcorp.co
m%2F> (R) .


This message was secured by Zi x
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-a14b8
12d34193c67&q=1&e=c282c366-779c-4db5-b2f0-3ee29aa3059e&u=http%3A%2F%2Fwww.zixcorp.co
m%2F> ® .


This message was secured by Zix
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-a14b8
12d34193c67&q=1&e=a8edea2d-33e2-4881-8cce-033a4868810e&u=http%3A%2F%2Fwww.zixcorp.co
m%2F> ® .


This message was secured by Zix
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-a14b8
12d34193c67&q=1&e=a8edea2d-33e2-4881-8cce-033a4868810e&u=http%3A%2F%2Fwww.zixcorp.co
m%2F> ® .


This message was secured by Zix
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-a14b8
12d34193c67&q=1&e=5f54c0f0-9ab2-4f0c-b3e8-f9d9a6c83d33&u=http%3A%2F%2Fwww.zixcorp.co
m%2F> ® .


This message was secured by Zi x
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-a14b8
12d34193c67&q=1&e=5f54c0f0-9ab2-4f0c-b3e8-f9d9a6c83d33&u=http%3A%2F%2Fwww.zixcorp.co
m%2F> ® .
```

```
----------------------------------------------------------------------
This message was secured by Zix Corp
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-a14b8
12d34193c67&q=1&e=d523e5b2-65a6-424d-9218-67a53ad52737&u=http%3A%2F%2Fwww.zixcorp.co
m%2F> (R) .


This message was secured by Zi x
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-a14b8
12d34193c67&q=1&e=d523e5b2-65a6-424d-9218-67a53ad52737&u=http%3A%2F%2Fwww.zixcorp.co
m%2F> ® .


This message was secured by Zix
<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-a14b8
12d34193c67&q=1&e=fe67c5cd-6d5a-40a8-a096-285e5b2502c5&u=http%3A%2F%2Fwww.zixcorp.co
m%2F> ® .


This message was secured by
Zix<https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-a1
4b812d34193c67&q=1&e=fe67c5cd-6d5a-40a8-a096-285e5b2502c5&u=http%3A%2F%2Fwww.zixcorp
.com%2F>®.


This message was secured by Zix(R).
```

# **Exhibit 6**
Final Written Counseling

**Asbury Automotive Group**
**Performance Counseling Statement**

Date: 10/03/2022

From: Malcolm R. Gage Jr.            Job Title: General Manager

To:   Michael Tupac                  Job Title: Sales Manager

This counseling statement represents:

[ ] Verbal Reminder
[ ] Written Counseling
[x] Final Written Counseling
[ ] Unpaid Suspension

Incident/Event/Observed Performance or Conduct:

As set forth in the 2022 Park Place Member Handbook, the Company respects the rights of Members to engage in protected concerted activity under the National Labor Relations Act ("NLRA"). This right includes the accumulation of information for the mutual aid or protection of two or more employees.

The Company does not, however, tolerate unwelcomed harassment of co-workers, regardless of the reason for such unwelcomed harassment. As stated in the Handbook, our corporate culture has zero tolerance for harassment. The Handbook expressly requires all members who have experienced or witnessed harassment to report such harassment.

The Company does not, moreover, tolerate conduct which interferes with the work performance of other Members. To the contrary, the Handbook underscores the importance of helping and supporting other Members.

On September 13, 2022, the Company received a written e-mail from a Member (1) complaining of unwelcomed harassment by you directed toward the Member, and interference with the Member's job duties; and (2) reporting conversations with other Members regarding unwelcome harassment directed toward such Members, and interference with their job duties. This unwelcomed harassment and interference related to information being accumulated by you for a potential lawsuit against the Company. The Members reported being uncomfortable working with you.

On September 15, 2022, the Company also received a verbal complaint from another Member complaining of unwelcomed harassment directed by you toward the Member. The unwelcomed harassment related to a transfer decision.

## Performance/Conduct Expectations:

The company is in the process of investigating these complaints. Going forward, you are warned not to engage in any further unwelcomed harassment of other Members regardless of the reason for such unwelcomed harassment. You are also warned not to engage in conduct with interferes with the work performance of other Members.

## Consequences of Failure to Improve:

You are also warned there is also zero tolerance at the Company for retaliation. Any retaliation against the Members who have complained of your conduct will be grounds for immediate discipline, up to and including termination.

_____     _____

**Manager Signature**                                **Date**

*The Team Member's Signature indicates he or she has seen the report and that the contents have been reviewed with him or her. The signature does not necessarily indicate agreement.*

_____     _____

**Team Member Signature**                          **Date**

_____     _____

**Witness Signature**                                **Date**

**Team Member Comments:** _____

_____

_____

# **Exhibit 7**
Email from R. Chadwick to R. Williams (Feb 21, 2023)

**From:** Bob Chadwick
**To:** Williams, Ryan D - OSHA
**Cc:** Kent Piacenti
**Subject:** OSHA Complaint No. 301010021
**Date:** Tuesday, February 21, 2023 9:23:05 AM
**Attachments:** Position Statement Letter- 2.20.23.pdf
Exhibit A.pdf
Exhibit B.pdf
Exhibit C.pdf
Exhibit D.pdf
Exhibit E.pdf
Exhibit F.pdf
Exhibit G.pdf
Exhibit H.pdf

Ryan,

Attached are Asbury's position statement and exhibits. Our office is still working on the redactions to Exhibit I which contains confidential customer information.

Thanks

Bob

**Robert G. Chadwick, Jr.**

Partner – Board Certified, Labor & Employment Law,
Texas Board of Legal Specialization

**Freeman Mathis & Gary, LLP**

**5851 Legacy Circle | 6th Floor | Plano, TX 75024**

**D: 469-895-3003 | C: 214-728-0122**

Bob.Chadwick@fmglaw.com | LinkedIn | Bio

www.fmglaw.com | Instagram | Twitter | Facebook



CA | CT | FL | GA | IL | IN | KY | MA | NJ | NV | NY | OH | PA | RI | TN | TX

Please read this important notice and confidentiality statement

**APP76**